<hr/>

NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.— June, 1879.

## VAN KLEECK *v.* PHIPPS.

*In the matter of the probate of the will of* JAMES D. INGERSOLL, *deceased.*

Any influence brought to bear on the mind of a testator, which leads him to surrender his free agency and adopt the will of another, is undue, and vitiates the will.

Though a person be persuaded by appeals to his generosity, his affection or his sense of duty, to make a will contrary to what he had contemplated, yet, if the will actually made be the legitimate result of such persuasion acting upon his untrammeled judgment, it is not the result of undue influence. But if such a persuasive appeal be made to a person of too feeble a mind to resist, or to one who, from physical or mental weakness, is incapable of enduring or repelling the importunity, such persuasion or importunity would be undue, and the will would be thereby vitiated.

Undue influence need not be established by direct proof; it may be inferred from all the facts and circumstances surrounding the testator.

To prove the exercise of undue influence, it is not necessary to show that the duress was visible, or physically exercised at the moment of the

execution of the will; but there must be such evidence as will satisfy the mind of the court or jury, that the duress existed shortly before, and continued its domination over the mind of the testator, at the time of the execution of the will.

If the existence of undue influence can be inferred from the circumstances of the case, the fact that the terms of the will were dictated by the testator, and that he executed it in the absence of the person possessing the influence over him, will not of itself validate the will.

Where a person occupying a confidential or fiduciary relation to the testator, procures a will to be written in his favor, a presumption arises against the validity of the will, and the *onus* is upon the proponent, of proving that the will was understood and executed voluntarily by the testator.

The testator, a bachelor, while at Augusta, Georgia, in April, 1876, was prostrated by an attack of paralysis, which affected his speech and mind. Mrs. P. and her husband, who were with testator at the time, and were old friends of his, took charge of him, and Mrs. P. nursed him personally. After four weeks' illness, testator improved sufficiently to be removed to the city of New York. He was taken to the residence of Mrs. P., and was attended by her family physician, although the Augusta physician had advised calling in another expert. On May 3, 1876, two days after his arrival in New York, the testator executed a will, giving all his property, of the value of $45,000, to Mrs. P., and appointing Mr. P. his executor. The will was drawn by Mr. P.'s lawyer, to whom the testator stated, in the presence of Mrs. P. and her husband, that he wanted to give all his property to Mrs. P., which statement the testator repeated upon the withdrawal of Mrs. P. and her husband from the room, at the suggestion of the lawyer. The testator died May 23d. During all this time he was confined to his bed, being more or less paralyzed, incapable of using his limbs, or of continued conversation, and easily moved to tears or laughter. Mrs. P. and her family were constantly about the testator. His relatives were informed by Mrs. P. when they called that the testator refused to see them. In 1874, the testator had made a will disposing of his property among his relatives and special friends, not including Mrs. P. On several occasions thereafter, and just prior to his departure for the South, the testator referred to this will, and told the executor therein named, where it could be found in case of his death. There was no evidence to prove any change in his relations to, or interest in, the several legatees of this will down to the execution of the second will. The testator, prior to this final illness, was known as a man of strong mind and resolute will.

*Held,* that the will in favor of Mrs. P. was procured by undue influence and was void.

Hazard *v.* Hanford, 2 *Hun,* 45, criticised. Seguine *v.* Seguine, 3 *Keyes,* 663; Deas *v.* Wandell, 1 *Hun,* 120; Cudney *v.* Cudney, 68 *N. Y.,* 148, distinguished.

APPLICATION for the probate of the will of James D. Ingersoll, deceased.

The will propounded bore date May 3, 1876, and was witnessed by Francis C. Reed, E. A. Marcy, and Phenix Babcock, and appointed James L. Phipps sole executor, and gave all decedent's estate, after the payment of his debts and funeral expenses, to Mary A. Phipps, wife of the executor.

Sarah S. Van Kleeck, niece of decedent, and a legatee under a former will, William Van Kleeck and Charles H. Leeds, executors named in the former will, filed objections to the probate, on the grounds that decedent, at the execution of the instrument, was not of sound mind or capable of making a will; that the instrument was procured by fraud and undue influence, &c., exercised by Mrs. Phipps, her husband, or some person unknown; that it was not voluntarily executed, but its execution procured as aforesaid; that decedent did not declare the same to be his last will and testament, and that the attesting witnesses did not subscribe as such at his request.

A former will executed by decedent, bearing date April 28, 1874, was given in evidence, by which he bequeathed $5,000 to his executors, to invest and pay the income to one Mrs. Leeds for life, and at her decease the principal sum to go to her daughter, Mrs. Van Kleeck; $5,000 in trust, the income to be paid to another Mrs. Leeds, at her death the principal to go to her daughters; $5,000 in like trust to be given to Miss Van Kleeck, if she should remain unmarried at his decease; $3,000 in trust, to a Miss Thayer, to be delivered to her six months after his decease; $1,000 in trust for Robert

Leeds; $1,000 to William M. Leeds; $1,000 in trust for the Reverend Penniman Leeds; $1,000 to the managers of the Presbyterian Church of Uxbridge, Mass; $1,000 to the managers of the Sunday-school of the Unitarian Church of the same place; $5,000 in trust for Daniel W. Leeds (his namesake), when he should be twenty-five years old; $1,000 to A. S. Richards, to be invested for the benefit of his two children; $2,000 to Mr. Richards, to be invested for the benefit of his two sons, when they became of age: he gave a trunk and clothing to Mrs. Leeds; a porringer to Mrs. Van Kleeck; his watch to Mr. Richards, and half of the residue to his executors, to be invested, and the income to be paid to Daniel W. Leeds, for life, and at his death, the principal to go to his heirs; the other half of the residue to be given to Charles H. Leeds; and if his estate should not be sufficient to pay the legacies, the executors were instructed to pay *pro rata* to his individual legatees, omitting the institutions named.

William H. Van Kleeck and Charles H. Leeds were appointed executors.

On the hearing, Erastus E. Marcy, one of the subscribing witnesses, testified that he knew decedent in his life time, and attended him as his physician in his last illness, at the house of Mr. Phipps, in this city; that he was present at the execution of the instrument propounded; that decedent made his mark; that this was three or four days after witness first saw him; that Mr. Reed, an attorney, was present, and asked decedent if the instrument was his last will and testament, and he answered to the effect that it was; that witness was called in as a witness; that Mr. Reed told decedent that witnesses were there; that

Mr. Reed informed witness that decedent wished him to be a witness, but he couldn't say whether anything was said at the time ; that decedent understood, and witness signed after decedent had made his mark ; that he signed in the presence of the decedent and the other witnesses. He regarded decedent of sound and disposing mind at the time ; that testator died May 23, 1876.

On cross-examination witness testified that he saw decedent May 1, 1876 ; that he had been Mr. Phipps' physician for several years previous ; that he was requested by Mr. Phipps to see decedent on the 1st of May ; that he didn't remember seeing Mr. Phipps before he went into the room ; thought he saw Mr. Babcock, a son-in-law of Mr. Phipps, who resided with him ; that he found Mrs. Phipps in decedent's room, and, he thought, a nurse. He examined decedent, and questioned him thoroughly in regard to his condition, mental and physical. He inquired of Mrs. Phipps as to his attack, and was informed that he had had an attack of paralysis a month previous, at the South, and after getting all the information he could get from her, he questioned decedent, and then prescribed ; Mrs. Phipps informed the witness that decedent had an attack of paralysis on one side, confined to his limb on the right side, and that his mind had not been affected ; that he did not lose consciousness or become comatose ; that for two or three winters before testator had been in delicate health, and went South on that account ; that he had no fever or cerebral trouble previous or then ; that decedent was a friend of the family. Witness did not examine decedent until he obtained a history of the case, then examined his pulse and tongue, asked him to raise his arm and leg, examined his side

and abdomen ; noticed a little irregularity in breathing ; decedent answered his questions promptly. He requested witness to call the next morning early, with eagerness ; witness called the next morning. Some of the questions propounded by witness to decedent required an answer more than yes or no. Witness asked him if he had had pain, and he answered that he had at one time, South, but not lately. The interview lasted about half an hour. The witness found the right arm and leg, the muscles of the right side and *thorax* nearly paralyzed ; but decedent could raise his arm and leg a little, on being requested, then that would drop, but witness could detect no lack of sensation ; decedent's head, face and neck were unaffected. From the facts gathered from Mrs. Phipps, witness concluded that it was an attack of non-inflammatory softening of the upper part of the spinal cord. He asked decedent many questions at different interviews, to most of which he responded promptly and intelligently. The only change witness observed was a slight disposition to weep when anything sudden occurred, which was an important symptom, invariably occurring where the origin of the trouble was in the brain, and often when in the spinal cord.

On the second and third visits, the witness asked decedent many questions, which he answered with promptness, decision, and intelligence. Mr. Babcock came for the witness to witness the will, in the evening. Mrs. Phipps and Mr. Reed, the attorney, were in decedent's room. Mr. Reed told witness he was sent for to witness a will, which he, Reed, had drawn up from decedent's own statement, and the decedent had requested witness to be sent for. Decedent then made his mark. Mr. Reed asked

him if it was done of his free will and consent, and if he understood its purport, which decedent answered in the affirmative, and that it was done without constraint. Witness was requested, by Mr. Reed, to listen to what was said. Mr. Reed held the paper, placed it on a book, placed a pen in decedent's left hand, and decedent made a mark with the left hand without assistance. The will was not read in witness's presence. The inquiry, if he made the will freely, was before making his mark. The decedent spoke promptly and positively. Witness subscribed because of the request of Mr. Reed. Witness saw decedent every morning thereafter till his death, and occasionally in the evening. There was no material change in his condition from the beginning to the end. The cause of death was softening of the spinal cord; pulse grew gradually weak, respiration being interrupted. Witness observed a tendency to weep on two or three occasions, without much manifest cause, in conversation. Witness thought that on one occasion decedent was unduly mirthful; he wept and laughed without adequate cause, which indicated excitement of the nervous system, and which might be from disease of the brain or the spinal cord, and was a universal symptom where the seat of the disease was the upper spinal cord. Decedent could understand without difficulty, but his use of language was short. His articulation was distinct enough to be understood without difficulty. The witness testified that in affections of the mind there would be incoherency in talk, and delirium; that a disposition to weep from inadequate, or slight causes, was a symptom of diseased brain, and that there would be lack of memory, inability to answer questions properly, perversion

of memory in cases, strong disposition to sleep, in others, wakefulness. That if the brain had been affected, decedent would have had symptoms indicating it; pains in the head, perhaps febrile symptoms, perversion of mind, perhaps delirium, and after the attack, more or less disorder in the muscles of the face and neck, and the sight would be affected. Mr. Reed asked witness to sign the will, and said it was decedent's request, in his presence, and near him, and in his hearing. Decedent appeared to hear readily, and responded perfectly. From witness's attendance and observation of decedent he observed no indication of mental disease, observed no delirium, discovered no lack of memory, and believed him to be perfectly coherent.

Francis C. Reed, a subscribing witness and an attorney at law, testified that he was requested by Mr. J. L. Phipps to meet the decedent May 3. He found him in bed, and was introduced to him as Mr. Phipps's lawyer by Mrs. Phipps. Witness said to decedent that he understood he wanted to make a disposition of his property. Decedent answered that he wanted to give his property to Mrs. Phipps. Witness then requested the other persons present to leave the room, and they did so. Witness then asked decedent if he desired to speak to him privately, concerning his affairs. Decedent said he did not; he only said he wanted to give his property to Mrs. Phipps. The witness then proceeded to draw the will, and after he had drawn it to the clause giving the property to Mrs. Phipps, he spoke to decedent about an executor. Decedent asked if Mrs. Phipps could not be executor, and witness said it would be more prudent to have somebody else; and decedent suggested Mr. Phipps's

name, which was inserted. Witness then told decedent that it was necessary to have two witnesses. Decedent asked witness to be one, and witness suggested sending for Dr. Marcy, his physician. Decedent then asked Mr. and Mrs. Phipps to send for Dr. Marcy, which was done. After witness had completed the will, he conversed with him as to whether he could sign it, and that if he could not, witness could sign it for him, and he could make his mark; and decedent indicated his preference for the latter. Either before or after Dr. Marcy arrived, witness read the will to decedent, and asked him if he understood it, and he said he did. Witness asked Dr. Marcy to sign as a witness with the others. Witness stated to Dr. Marcy that he had been called to draw the will, and he had drawn it, leaving the property to Mrs. Phipps. Witness asked decedent to request the witnesses to witness its execution, and he did so. The instrument was placed on a book, and a pen handed to decedent, and he was shown where to make his mark. Decedent took the pen, and made a mark. Witness then took the will, and asked him if he declared it to be his last will and testament; he answered he did. The witnesses then subscribed in decedent's presence. Decedent then spoke of a deed being prepared for land he had contracted to sell in the West. When witness wrote the provisions that his executors should pay all his debts and funeral expenses, decedent said that he owed no debts of consequence. It appeared, on cross-examination, that Mr. Reed had been Mr. Phipps's lawyer, and was personally acquainted with Mrs. Phipps, but did not know decedent till he was called in on that occasion, and did not hear of a former will until a short time

before decedent's death. The witness accompanied Mr. Phipps from his office to Phipps's house to draw the will. When he was introduced to decedent by Mrs. Phipps, the colored servant and perhaps Mrs. Phipps were present. When he read the will to decedent, the latter said "that was the way he wanted it," and placed his hand on the book to make his mark without any assistance.

Felix Babcock, a subscribing witness, and son-in-law of Mr. Phipps, testified substantially to the same facts as the preceding witness. He further testified that he had known decedent eight years; that he was of sound mind and memory at the time of the execution of the will. He also testified that decedent was an old and intimate friend of, and frequent visitor at the house of Mr. and Mrs. Phipps, and that about ten days before his death, the decedent gave Mrs. Phipps about $25,000.

Toby Edwards, a waiter at the Planters' Hotel, Augusta, Ga., where the decedent was stopping, testified that he waited on decedent and that Mrs. Phipps visited decedent, and was generally in the room. He heard a conversation between Mrs. Phipps and the decedent, about one Mrs. Platt taking care of him, and he said "if he was left in Augusta he would die, and he would rather be laid in the gutter." The witness traveled with decedent, and with Mr. and Mrs. Phipps, from Augusta to New York. They went directly to Mr. Phipps's house in New York, and as soon as decedent was fixed in bed he said to Mrs. Phipps that the next thing he wanted was Dr. Marcy. Dr. Marcy was sent for, and came the same evening. When witness first took charge of decedent, he could not move his afflicted hand, but after he reached New York he could move his finger and hand gently up

to his breast and gradually to his mouth, and then got it as high as his face, and could take hold of a walking-cane and try to balance it. Mrs. Phipps was in the room all the time, and he often spoke of her kindness to him ; witness heard him say, at the Planters' Hotel, that he didn't care for Mrs. Baker ; when Mr. Leeds called twice witness informed decedent of his call, and decedent said he didn't want to see him. A second time, on Sunday, Mr. Leeds came up to decedent's room, Mrs. Phipps and witness being present. Mr. Leeds asked decedent how he felt ; he said " Very well," and turned his face to the wall and said, " Go out !" Mr. Leeds answered " Go out ?" Decedent said, " Yes, go out !" and he did go out.

On cross-examination, he testified that he remained with Mrs. Phipps until June. He came back to the city in October, and went to Mr. Phipps's house. He was not acquainted with them until he met them at the Planters' Hotel. On Tuesday before decedent left Augusta, he asked witness where he had been ; and said " You are the very man I want to go with me home." Witness then made the arrangements, and told Mr. and Mrs. Phipps that he was going with decedent to take care of him. He came on with decedent, and got to New York on the 1st of May, in company with decedent and Mr. and Mrs. Phipps. He was in constant attendance on decedent, at Richmond. Decedent asked witness if he knew where he was, witness said he didn't know, decedent said it was Richmond. When at Baltimore, they went to Barnum's Hotel. When he got to the hotel, decedent said he felt much better, that it was a very nice place, and told witness to go and get his dinner, and come

back. On his return decedent said, "This is a nice place," witness said, "Yes, I think it is." Decedent said "Now. you go out and take a walk round." On his return decedent asked him what he had seen, &c. Witness stated in detail various actions of decedent showing great improvement in his mental and physical condition, and to his repeated expressions of his returning health and strength.

On cross-examination, the witness testified that he was in the room with decedent when two gentlemen came in together, an old gentleman, and his son. The old gentleman's name was Taylor. When he came in Mrs. Phipps was present. Mr. Taylor took a letter out and handed it to decedent. Decedent said it belonged to Mrs. Phipps ; it was hers, and the letter was passed to her by Mr. Taylor. That witness didn't remember that decedent took the letter in his hand ; that it was a large letter ; that witness then left the room, leaving the two gentlemen with decedent and Mrs. Phipps; that he never heard of the transaction afterwards.

On the part of the contestants, Abiatha Richards testified that the decedent had a desk and safe in his store, and came there occasionally, the witness having succeeded to the shoe business of decedent. The decedent was sick in 1875, and witness visited him nearly every day for three months. He resided at the St. Nicholas Hotel for fifteen years. The decedent got out in April, 1875, but was never well afterwards, and went South in December, 1875. He had an account with witness's firm at that time, and left some money, a desk, a safe and trunks there, and a tin box. Witness had two or three letters from him after he went South, in which he gave

witness notice of his arrival, and a description of his hotel—merely social letters. Witness first heard of his ilness by telegram received from Mr. Phipps ; then received a second. On receipt of the second telegram he telegraphed to Mrs. Phipps, and received an answer ; then sent Mr. Ludlum to Augusta. He was absent for two or three weeks. After decedent returned from the South, Mr. Phipps called at witness's store, and informed him that decedent was at his house, would let witness know when he was able to see him, and that decedent wanted to know the state of his account. Witness sent the account in the afternoon, and called on decedent, who seemed inclined to talk. The witness could not understand anything he said, so he left the room. The decedent could not articulate. The next morning Mr. Phipps called and said decedent was dead.

William H. Ludlum testified that he went to see decedent at Augusta, the first Tuesday in April. Met Mr. Phipps, and went with him the next morning to see decedent, about eleven o'clock ; found Mrs. Phipps there. The decedent shook hands with witness, and commenced to cry. Witness asked him if he recognized him, and he made a motion that satisfied witness that he did.

Charles H. Leeds, testified that the decedent was witness's father's first cousin. He also testified to the relationship between decedent and the Leeds and Van Kleeck families : that decedent's feelings towards his relatives were always kindly. The witness called several times to see decedent at Mr. Phipps's house, but did not see him ; but on May 7, he had an interview with him ; that he mumbled something that witness couldn't understand, seemed to express an aversion to seeing wit-

ness ; witness saw him twice, and he seemed to be in the same condition. Witness judged that decedent was not fit to do anything. The tin box was opened in the surrogate's office ; two envelopes were found ; the inner one contained a will, with a letter of instructions directed to Mr. Van Kleeck and witness, dated March 15, 1875. The factum of this will was proved by the subscribing witnesses.

Sarah J. Van Kleeck, a sister of one of the executors of the will of 1874, testified to the long-continued intimacy with the decedent, to his frequent visits and to the drives with decedent down to the period when he went South. The decedent had informed her that he had remembered her in his will. Mary S. Van Kleeck also testified as to the intimacy existing between decedent and her family, and his visits to them. She called after his return from the South at Mr. Phipps's house. Mrs. Phipps said decedent was not well enough to see her, that he was very sick, but she thought him a deal better in the afternoon, but that no one could understand what he said in the morning, but in the afternoon they could make out a little. Mrs. Phipps said that decedent begged her not to leave him, and said he would give her $50,000 when he got well, but that she thought nothing of that ; that he also said he would give her $50,000 if she took care of him, and buried him beside his mother ; he would give her $50,000 if he got well. William H. Van Kleeck testified to the discovery of the former will, and the letter of instructions. Decedent requested witness in May or June, 1875, to consent to be his executor, and informed him where he would find his will, and a letter with his instructions to the executors, and he wished

them implicitly to be followed. The night before he left for the South, he bade witness good bye, and said he might never see him again, and if he did not,. witness would find his will and everything just as had been stated, and he wished he would see everything properly cared for.

The instructions to Messrs. Van Kleeck and Leeds, executors, bore date March 15, 1875, and stated that he had selected them as executors, and begged them to accept ; that his estate was not one-tenth so large as in 1865 ; that his will was not much like the will of that date, and gave instructions for sale of the property, in their discretion, recommending that they should not have a lawyer, but manage the business to suit themselves; ask no questions, and answer none ; keep it all to themselves ; pay his personal expenses promptly, and his debts, and stated that he desired to be buried in Uxbridge, Mass., beside his mother and brother ; instructed them as to the style of the tombstone ; and stated that they should give no bonds for the execution of the trust.

George C. S. Choate, a physician, testified that he made a specialty of mental diseases ; he had read the evidence of Dr. Campbell, Dessansure C. Ford, Dr. Lewis Ford and Dr. H. H. Steiner taken on commission, and of Dr. Marcy, and explained the effects of an attack of *hemiplegia*, and expressed the opinion that the decedent's difficulty was in the brain, and that the *coma* indicated that ; that at the time of the attack of decedent his mind was abolished ; that his change of feeling and emotions were common symptoms of a disordered mind, connected with *paralysis ;* that his laughing and weeping indicated loss of control; his changed disposition of

8

his property, and his treatment of Mr. Leeds, if not explained, would indicate a disturbed mind. His neglect to notify his nurse of the calls of nature, in *hemiplegia*, indicated *dementia*. From the facts and circumstances he would be of the opinion that he was probably of unsound mind three days after he arrived in New York, but from his talking so little, witness could not give a very positive opinion, but so far as it went, witness thought decedent was not capable of transacting business or having the management of his property.

It was shown, by other witnesses, that the decedent was a close, sharp man of business ; methodical and particular, prompt and determined ; not of vacillating mind, nor easily influenced ; secretive, companionable, of good judgment in business.

The contestants read, in evidence, the deposition of Isabella C. Dodge, taken on commission, that she knew decedent at the Planter's Hotel, and was employed to wait upon him, and acted as nurse from the 31st of March, 1876, until the 23d of April, 1876. Decedent was thoroughly paralyzed on one side ; did not seem to recognize persons or things, or comprehend questions. Mrs. Phipps paid him great attention ; she slept in an adjoining room ; she came in occasionally, brought him delicacies, and remained when witness was necessarily absent. She attended to him as if he had been an infant. The decedent had no use of his right arm or leg ; was fed with a spoon, taken out of bed and carried into another room, and was quite unable to control himself, and partly unconscious of movements of necessity. His tongue was paralyzed. Witness understood him from signs ; he frequently shed tears ; never

knew him to laugh or become mirthful. Witness received her instructions from a doctor. Mrs. Phipps said the doctor had directed that he should see no one. Witness also testified that on her return from her meals, she found Mrs. Phipps occasionally with decedent, whispering, which would cease on her return. When witness left on Saturday, before the Thursday of decedent's departure, he was a mental imbecile, without wants, desires, or capacity to express them. Witness saw decedent last on the 3d of April, 1876.

Dessausure Ford, whose testimony was taken by commission, testified that he was a physican at the Planters' Hotel, and attended decedent in the early part of 1876, two or three times daily and nightly until April 12, 1876. On his first visit he found him comatose. Decedent was fatuous, utterly unable to recognize him, or give an intelligent answer to questions ; paralyzed on one side. From witness's first visit to his last, decedent grew more feeble daily ; he could not use his right arm or hand ; he thought it was his right side that was paralyzed. Witness heard him say yes and no. Decedent made his wants known by easy movements, interpreted by an intelligent nurse. Witness saw decedent shed tears caused by his disease ; this was an indication of his mental weakness. Witness saw him violent, striking Mrs. Phipps. Decedent's brain was diseased, the mind and mental faculties impaired, so as to be unable to transact ordinary business ; he was not of sufficient mental capacity to intelligently dispose of anything by will. Witness never witnessed sufficient intelligence on part of decedent to give expression to any want or desire ; that he, witness, gave general orders to the nurse not to allow

visitors. Another witness who was employed to wait on decedent at the Planters' Hotel, testified that decedent could not help himself at all, or move in bed without assistance; that he could talk, but not plainly, but sometimes witness understood him; had seen him cry. The witness heard Mrs. Phipps say one day to decedent something about making a will; he said to her, "No." She said, "You will make a will to me, then?" He said, "Yes."

Henry E. Campbell, a physician, testified that he was called on to attend decedent at the Planters' Hotel. He found the decedent in the care of Mr. and Mrs. Phipps. He was wholly unable to speak or articulate, and appeared to be stolid. Witness never saw him shed tears or laugh. Decedent was in a perfect state of inanity, without speech or conduct of any kind. The disease was in the brain, not in the spinal cord. Decedent's mental faculties were wholly clouded; he neither possessed power to transact ordinary business nor dispose of his property by will. He had a rupture of a blood-vessel on the brain, which always incapacitates from clear and consecutive thought. From decedent's condition then, witness was of the opinion that he had not sufficient mental capacity to make a will on the 3d day of May, 1876.

In rebuttal, James L. Phipps, the executor named in the will propounded, and the husband of Mary A. Phipps, the principal beneficiary, testified that he had known decedent thirty-five years; that decedent was in the habit of visiting at witness's house as a guest. During his illness in the winter of 1875, at the St. Nicholas, he visited him, and decedent used to come to his house and stay several days at a time. He was also intimate

with witness's sister, took her to parties and balls, and used to take witness's daughters riding ; he had often exchanged checks, and occasionally decedent had borrowed sums of money of witness. Witness was engaged in business in 1875 and 1876, and lost all his money, and so informed decedent. The night before he started for the South, decedent visited witness's family and consulted witness's wife as to the clothing he should take, and she advised him about it. Decedent took some medicine which witness's wife had prepared for him, and witness informed him that he thought of going South himself soon. That witness started in the middle of February following, with his wife, for Jacksonville, and the next morning after their arrival decedent called to see them at the hotel, he having stopped at a different hotel. The decedent came to their room ; they remained at Jacksonville for several weeks, and decedent called every day in a friendly and familiar way. They went from Jacksonville to Savannah. from thence to Augusta, decedent going with them to Savannah. Decedent preceded them, and arranged at the hotel for their arrival at Augusta, meeting them at the depôt with a carriage, and had arranged for rooms at his hotel for them. When witness found decedent ill at Augusta, in the hotel in the morning, decedent asked witness to go for his wife, and he did so, and she came to his room, and asked him what had happened ; and he said he was ill, and a lone man, and that she was going to leave him ; but she said she would not leave him, but would take care of him. He told her that his trunk, and bag, and clothing were at the depot, and his money under his pillow, with his keys. Witness looked under his pillow, found his money rolled in

a package, and his keys, and his things were found at the depot. Soon after decedent returned to New York, he requested witness to see Mr. Taylor, his banker, and request his account. Witness did so, but found Mr. Taylor out, and on his return home, he informed decedent of what he had done. Decedent then requested Mrs. Phipps to write a letter to Mr. Taylor, he dictating what to write. Mrs. Phipps did so, and witness took the letter to Mr. Taylor personally. That afterwards Mr. Taylor and his son came to the house, and had a conversation with decedent, and gave the account to decedent, who seemed pleased, and said there was $3,000 more than he anticipated. That Mr. Taylor brought $29,600 and some odd dollars, which was put in a package, after it was counted over. Witness counted it at the request of Mr. Taylor; it was then put in a package addressed to Mrs. Phipps; decedent handed it to her, saying: "This is yours, take care of it." This was said after Mr. Taylor had left. His wife took the money and put it in the safe.

Witness also testified that, prior to decedent leaving Augusta there was a talk about his going to the St. Nicholas, when witness said he should not go, that it was not a place for him, and asked him if he would prefer to go to his house; he answered certainly, that there was no place he could go to, and he didn't know any other place. The first conversation he had with decedent about a will, was the day it was signed. The decedent had never spoken to witness upon that subject before, nor witness to him. He didn't know of his making a former will, he had never heard of it. Decedent requested him to bring a lawyer to make his will.

Up to the signing of the will, witness never heard from any one as to his proposed disposition of his property. Witness estimated decedent's property at about $45,000; that witness had mentioned his losses to decedent, that he was bankrupt some five years ago (the early part of 1873); that the conversation and conduct of the decedent after his attack to the time of his death, was in his opinion rational.

Henry H. Steiner, a physician, residing at Augusta, testified that he was first called in consultation with Dr. Ford, and visited decedent daily from the 21st of April, 1876, until the 28th, except two or three days. He found decedent paralyzed on the right side, unable to speak, morose, excitable, and capable of very little mental effort, and very little change for the first two weeks, in his mental condition, none in his physical; that he could articulate more distinctly, more motion and sensation, in the last week of his stay; that Mr. and Mrs. Phipps were exceedingly kind and constant in their attendance. Decedent requested that they should not leave him. During the latter part of the time in Augusta decedent was much more rational; witness saw no evidence of incoherency during the last week of his stay. He had seen decedent shed tears on different occasions. During the last week there was a decided improvement in his mental condition—speech improved; decedent could make witness understand without much difficulty, controlled his attendants, and took great interest in the arrangements for his journey. Decedent was not easily influenced by those around him; had a strong, stubborn will. Witness never advised against his acquaintances seeing him, but concurred

with Dr. Ford that it would not be advisable for the gentleman from New York to see him.

William B. Taylor testified that he saw decedent twice in May, 1876, during his illness at Mr. Phipps's house. When he entered decedent's room decedent extended his hand, then conversed about ten minutes, principally as to his health; he asked after several friends in the office. Decedent said "Good day" to witness, and extended his hand. Witness's second visit was about the 17th of May; decedent was then occupying a sort of crib; witness's son accompanied him. Decedent shook hands with witness and his son, and spoke pleasantly. Witness said he had received a message from him, saying he wished him to sell out the stocks on hand, and bring the money; he asked decedent if that was right, decedent answered "That it was all right," and asked if he had sold everything. Witness answered that he had. Decedent then asked the amount of money due him. Witness answered, "$29,692.73." Decedent said "That is very good, is it not?" Witness said, "Yes, very good, indeed," and that he had the money, and had drawn a receipt which he would read. Witness read the receipt and produced it for decedent to sign; witness gave him the money in his hands; decedent kept it in his hands three or four minutes. Witness asked if he should lay it down on the table. Decedent said, "Yes, anywhere," and witness laid it on a small table near him, and said he hoped to see him about again. Decedent said it was doubtful. Witness remained in decedent's room about three-quarters of an hour. His conversation appeared to witness to be perfectly rational.

Mary A. Phipps, the wife of James A. Phipps, the ex-

ecutor, testified that she never attempted to prevent any of his relatives or friends from seeing decedent ; she first notified them of his illness, and they came to see him. The morning he was taken ill she went out at 8 o'clock in the morning and found them. Decedent seemed to suffer no pain except from the deadness of his limb, he had a good appetite till a week before he died. Mrs. Baker and Mrs. Parks went into the room to see decedent whenever they chose ; nobody prevented them going in, the door of his room was always open ; never heard him speak of a will till the day he made it. Witness gave with considerable detail the extent of her acquaintance and social intercourse with decedent, and his manifest interest in the welfare of the family, making himself at home at their house.

On cross-examination she testified that decedent told her, that everything he had was hers. The day after he made his will, she asked him if he didn't wish to give something to his friends, he said ; "No." She asked if he didn't want to give Mrs. Hand something, he said "No ;" or Mr. Richards' son ; he answered : "No ;" or if he hadn't any friend he might wish to give something to, he said "No ;" and that he gave it to witness because she deserved it, and he wanted her to have it ; that she was the only person he cared for. This was on the day he made his will. She attended upon him eight weeks, and everything was done in her house for his comfort. She had a conversation with decedent about people calling on him ; when Mr. Leeds called he said he didn't wish them to call, he didn't wish to see them ; once decedent told her that he didn't want to see anybody but her family. She took care of him five weeks in Augusta.

She had bought tickets to return the day after he was taken sick, but remained with him because he begged her to stay. She mended his clothing, and made a garment for him. The day after he gave her the money, he asked her what she had done with it. She said she had sent it to the bank; he asked what bank; she told him the Tenth National; he asked what per cent. she got, she told him three per cent., and that he had asked her if she had taken care of it. She was present when decedent made a mark to the receipt of Mr. Taylor, and left the room with Mr. Taylor's son and Mr. Phipps. The money was left on the table. The gift to her was after that. She never spoke to him upon the subject of the will, nor he to her; she never heard of the old will. Decedent wept when he met an old friend whom he had not seen for a long time. Witness gave the details of the gift of the money to her. Other testimony, mainly corroborative of the foregoing, was given, and the case submitted.

John H. Drake, *for proponent.*

Jas. K. Hill, *for contestants.*

The Surrogate.—As there is no question raised against the due and formal execution of the instrument propounded as a last will and testament, no further consideration of that part of the case is necessary, especially as the testimony abundantly shows a substantial compliance with the requirements of the statute.

A careful consideration of the testimony, though very conflicting upon the point, I think leaves some doubt as to the mental capacity of the testator to have executed a will before his departure from Augusta. The testimony of the physicians, of course, is most reliable, as their

duty and attendance upon him called them to observe carefully his mental condition, and I think that testimony is more reliable than that of any attendants, or the evidence of Mr. and Mrs. Phipps, who are obviously biased. Dr. Dessausure Ford appears to have visited decedent, for the last time, on the 12th day of April; Dr. Campbell on the 14th, Dr. Lewis D. Ford on the 6th, and they all concur substantially in the opinion that he was incapable of understanding or attending to ordinary business transactions. Dr. Steiner, however, was in attendance upon him from the 1st of April until the 28th; having taken charge of him April 18, and continued to his departure from Augusta, and may well be regarded as the more reliable witness, respecting the decedent's mental condition in the latter part of his stay at that place. His testimony shows that while decedent was capable of but very little mental effort in the early part of his attendance upon him, he became much more rational during the latter part; that he saw no evidence of incoherency during the last week of his stay; that there was a decided improvement in decedent's mental condition during the last week, and in his articulation, which enabled him to be understood without much difficulty, and that decedent controlled the arrangements for his journey home.

This testimony would seem to prove sufficient mental capacity to make a will, if no important influences were brought to bear upon his mind. The decided weight of testimony in respect to decedent's condition at the time of the execution of the instrument in question, tends to show the gradual improvement in the decedent's mental condition, up to the time of such execution, and indeed

down to the 18th day of May, when the receipt of the money from Mr. Taylor, and his giving of a receipt therefor took place, which leaves no doubt of his then mental soundness.

But while it is true that under the authorities this evidence shows an intelligent and disposing mind, sufficient for the execution of such an instrument, it is quite apparent, from the testimony, that his mind was somewhat affected by his paralysis, and must have been in a weak condition at the time of its execution. This fact must be considered in determining the final question, whether the instrument was the result of undue influence exercised upon the mind of the testator or not.

REDFIELD (*American Cases upon the Law of Wills*, p. 472), in defining what is meant by undue influence, says : " We may safely say that where an unjust will is produced by deception and fraud, it cannot be upheld. So too, where such a will is the offspring of any influence brought to bear upon the testator in any manner, so as to overcome his free agency, it cannot be sanctioned by law. It matters not whether the influence be force, or fear, or importunity, destroying peace of mind. It is often said in the cases, that influence resulting from love, duty and affection, will not be regarded as unlawful. *But we have never known a* case where even this kind of influence was carried to the extent of producing an unjust will, more through the agency of the principal beneficiary than of the testator, that it could be upheld in a court of justice." The same learned commentator, in his treatise upon the Law of Wills, page 519, cites, with approbation, the language of EYRE, C. B., in Mountain v. Bennett (1 *Cox*, 355), as follows: " If a dominion

was acquired by any person over a mind of sufficient sanity to general purposes, and of sufficient soundness and discretion to regulate his affairs in general; yet, if such a dominion or influence were acquired over him, as to prevent the exercise of such discretion, it would be equally inconsistent with the idea of a disposing mind (as if actual force were resorted to)."

See also Tyler v. Gardner (35 *N. Y.*, 559), in which Judge PORTER cites with approval Bergen v. Udall (31 *Barb.*, 9).

In Turner v. Cheesman (15 *N. J. Eq.*, 265), the rule was stated to be that the influence exercised over a testator, which the law regards as undue, or illegal, must be such as to destroy his free agency, but no matter how little the influence, if the free agency is destroyed, it vitiates the act which is the result of it.

The amount of undue influence which will be sufficient to invalidate a will, must, of course, vary with the strength or weakness of the mind of the testator; but the influence which will vitiate a will must be such as in some degree to destroy the free agency of the testator, and constrain him to do what is against his will, but what he is unable to refuse, or too weak to resist. The influence, to vitiate an act, must amount to force or coercion (moral coercion), destroying free agency; it must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act. Further, there must be proof that the act was obtained by the coercion, by importunity which could not be resisted; that it was done merely for the sake of peace, so that the motive was tantamount to force or fear. (*Jarman on Wills*, 36, 39; and see Davis

*v.* Culvert, 5 *Gill & J.*, 302; and Gilbert *v.* Gilbert, 22 *Ala.*, 529.)

In Dailey *v.* Dailey (3 *Bradf.*, 481, 507, 8), the Surrogate draws a distinction between duress and undue influence, and in describing the nature of the latter, proceeds to say : "The stronger will frequently acquires an extraordinary power over the weaker, not by mere dint of importunity, by threat or force, but by that steady persistence, that unrelenting pursuit ·of its purpose which wears away less stubborn determinations, or again, by artfully taking advantage of the play of emotions and passions, appealing to prejudices, flattering weaknesses, and fomenting quarrels. A *dominion* thus acquired, if employed to effect a testamentary act, may be just as potent, distinct, and positive in its results as if coercion had been used, and I cannot perceive why it should not be viewed in the same light, and receive the same treatment at the hands of the court, as palpable duress."

The undue influence must be of such a character as to dominate the will of a testator, and substitute the will of another in its stead. There must be such importunity or coercion as could not be resisted, so that the motive impelling the testator is tantamount to force or fear. (Leeper *v.* Taylor, 47 *Ala.*, 221 ; Tyson *v.* Tyson, 37 *Md.*, 567 ; Bicknell *v.* Bicknell, 2 *Thomp. & C.*, 96 ; Rutherford *v.* Morris, 77 *Ill.*, 397 ; Gardiner *v.* Gardiner, 34 *N. Y.*, 155.)

In *Redfield on Wills*, 525, after an exhaustive review of all the authorities upon the subject, the result of such review is stated to be that such influence, to avoid a will, must be such as " *First,* to destroy the freedom of the

testator's will, and thus render his act obviously more the offspring of the will of others than of his own. *Second*, that it must be an influence specially directed towards the object of procuring a will in favor of particular parties. *Third*, if any degree of free agency, a capacity, remained in the testator, so that when left to himself he was capable of making a valid will, then the influence which so controls him as to render his making a will of no effect, must be such as was intended to mislead him to the extent of making a will essentially contrary to his duty, and it must have proved successful to some extent, certainly."

In Hazard *v.* Hefford (2 *Hun*, 445), Mr. Justice GILBERT says : " Evidence that the testatrix had been influenced in making a will, would lead to no legal result. Such an inquiry would lead to an investigation of the motives and the reasons operating on the mind of the testatrix to the confessions of a debt. It is therefore a wise and salutary rule that requires proof of actual coercion and fraud."

If the learned judge, by this language, intended to hold that, in order to establish undue influence sufficient to overturn a will, actual coercion or fraud must be proved, I am of the opinion that he states the doctrine altogether too broadly, unless he designs to hold that the exercise of influence or persuasion, amounting to the control of a testator's free agency, may be denominated coercion, and in a sense it may be what in the books is called moral coercion.

In Rollwagen *v.* Rollwagen (63 *N. Y.*, 504), the court holds that influence exercised over a testator, which the law regards as undue or illegal, must be such as to destroy

his free agency ; but no matter how little the influence, if free agency is destroyed, it vitiates the act which is the result of it.

The result of these authorities, together with many others that might be cited, seems to be that any influence brought to bear upon the mind of a testator, which leads him to surrender his free agency and adopt the will of another, is undue to the extent of avoiding the will. If a person be persuaded by appeals to his generosity, his affection, or his sense of duty, to make a will contrary to what he contemplated, yet, if the act be the legitimate result of such persuasion, acting upon his untrammeled judgment, it is not an unlawful persuasion, and a will is not a result of his surrender of his free agency, but rather the result of another's persuasion upon an independent mind, capable of compliance or refusal. If, however, such a persuasive appeal be made to a person of too feeble a mind to resist, or to one who, from physical or mental weakness, is incapable of enduring or repelling the importunity, such persuasion or importunity would be undue, for the reason that it overcame and controlled the will of the testator, and his act became but the expression of the will of another. (See *Redfield on Wills*, 529.)

Having considered and clearly defined what constitutes undue influence, it becomes necessary to consider briefly what testimony is necessary to establish such an undue influence.

In Marvin *v.* Marvin (3 *Abb. Ct. App. Dec.*, 192), it was held that undue influence in the making of a will might be inferred from circumstances. In Reynolds *v.* Root (62 *Barb.* 253), it was held that direct evidence of undue influence was not necessary ; it may be, and most fre-

quently is, a legitimate inference from other facts and circumstances in the case.

In this case the inference was sought: *First*, from the provisions of the will; *Second*, from what occurred at the making of it; and *Third*, from the mental and bodily condition of the testator, and his situation in the family of his son, whose family were the greatest beneficiaries under the will. In Forman *v.* Smith (7 *Lans.*, 443), MILLER, P. J., says: "Direct proof of undue influence can never, or at least but rarely, be given, and ordinarily it must be established by circumstances and inferences, to be drawn from facts and the character of the transaction. These facts could scarcely be known to the subscribing witnesses, who are simply called to attest the execution, and not to prove what usually would be beyond their knowledge. It also raises a violent presumption of fraud and undue influence, where a will executed by an old man differs from his previously expressed intentions, and if it is made in favor of those who stand in confidential relationship to the deceased, which should be overcome by satisfactory testimony." (See Davis *v.* Calvert, 5 *Gill & Johns.*, 269; Tyler *v.* Gardner, *supra;* Lewis *v.* Mason, 109 *Mass.*, 169.)

*Redfield on Wills*, at p. 522, says: "Where the influence is shown to be absolute, and irresistible over the testatator upon general subjects, and there were constant opportunities of exerting such influence, and the will is unreasonably and extravagantly in favor of the party possessing such influence, the inference is legitimate that it was the result of that influence, and that even though the will were executed in the temporary absence of such person, upon the theory that the temporary withdrawal

of that influence did not relieve the testator wholly from its effects."

In the Matter of Humphrey (26 *N. J. Eq.*, 513), it was held that whether, in any case, there was undue influence exerted upon the testator, must be determined from the facts.   It is not a presumption, but a conclusion.   In Sears *v.* Schafer (6 *N. Y.*, 268), the court said that undue influence will be inferred from the nature of the transaction alone in some cases ; in others, from the nature of the transaction, and the exercise of occasional or feeble influence.   In Rollwagen *v.* Rollwagen (63 *N. Y.*, 519), Judge RAPALLO says : "Undue influence is not often the subject of direct proof.   It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it, and the acts and declarations of such person" (citing numerous authorities).   And at page 520, he well says : "A competent testator may bestow his property upon the objects of his affection, and he may from gratitude reward those who have rendered him services, but if one takes advantage of the affection or gratitude of another, to obtain an unjust will in his favor, using his position to subdue and control the mind of the testator so as, substantially, to deprive him of his free agency, then the fact that affection or gratitude was the moving cause makes it no less a case of undue influence."

In Fagan *v.* Dugan (2 *Redf.*, 341), I had occasion to consider this question, and at page 348 it is stated that " to prove that undue influence was present at the par-

ticular time of the execution of the instrument, it was not necessary to show that the duress was visible, or physically exercised at the moment of the execution, but that there must be such evidence as will satisfy the mind of the court or jury that the duress existed shortly before, and continued its domination over the mind of the testatrix at the time of execution; and that fraudulent results were usually attained by slow, adroit, and covert processes, manifested by numerous acts, each of which might be trifling in itself, but which, when combined, were sufficient to convince the mind of the existence of fraud." Indeed, if undue influence or fraud be resorted to in any case, to procure the execution of a will in favor of the person exercising it, it would effectually defeat its object to exhibit any evidences of such influence at the *execution* of the instrument. If the undue influence had taken effect upon the mind of a testator, so as to subject it to the control of another, the adherence of the testator to the purpose thus influenced would be likely to manifest itself in dictating the terms of the will, and in its execution, though the person thus dominating the mind of the testator might be absent therefrom.

These principles may seem to contravene the doctrine enunciated in Seguine *v.* Seguine (3 *Keyes*, 363) and Deas *v.* Wandell (1 *Hun*, 120). In Cudney *v.* Cudney (68 *N. Y.*, 148), it was held that an inofficious or undutiful will raised neither the presumption of mental incapacity or undue influence, and that it is not sufficient to show that a party benefited by a will had the motive and opportunity to exert undue influence, but there must be evidence that he did exert it.

But, when properly considered, these cases are not inconsistent with the rule that undue influence may be shown by circumstances, for if it be shown by circumstances, then there will be *affirmative proof* that it was exerted.    Otherwise, these cases would entirely overrule the well-settled principle, that if a person occupying a confidential or fiduciary relation with the testator writes himself a legatee, or procures a will to be written in his favor, a presumption arises against the validity of the will, and the *onus* is imposed upon the proponent of proving that the decedent understood the terms of the will, and that it was executed voluntarily.

In Vreeland v. McLelland (1 *Bradf.*, 393) it was held that a will drawn in favor of an executor or trustee, who was in the active management of the estate, and had not accounted with the *cestui que trust*, could not be supported without satisfactory evidence of its entire fairness.    The fiduciary relation between the party creating a presumption against the act, and rendering necessary clear proof of volition and capacity, and that decedent, being of irregular and intemperate habits, of weakened capacity, and dependent on the executor, whom he had made his devisee for the satisfaction of his pecuniary wants, the legal presumption was confirmed ; and the proof, being defective, the will should be rejected.    The same doctrine is maintained in Lake v. Ranney (33 *Barb.*, 49) and Newhouse v. Godwin (17 *Id.*, 236).

In Tyler v. Gardiner (*supra*), at page 595, Judge PORTER says :  " It is no sufficient answer to the presumption of undue influence, which results from undisputed facts, that the testator was aware of the contents of the instrument, and assented to all its provisions ; this was the

precise purpose which the undue influence was employed to acccomplish." In Heguenin v. Baseley (14 *Ves.* 299), Lord ELDON says: "The question is not whether she knew what she was doing, had done, or proposed to do, but how the intention was produced."

In McLaughlin v. McDevitt (63 *N. Y.*, 213), Chief Justice CHURCH says, in commenting upon the facts of that case: "During this period, he (the principal bene-ficiary) had access to, and was the only person who had the care, control, and management of the deceased. The bequest in his favor is contrary to the repeatedly-ex-pressed intention of the testator, and there is evidence that he kept the testator excluded to some extent from his friends. Under all the circumstances it behooves the beneficiary to be provided with evidence that the instru-ment expressed the honest, spontaneous purpose of the testator to reverse his previous testamentary disposition. True, it does not appear precisely what the means em-ployed were. The testator was incurably sick; it was eleven days before his death, and whether the testator was so managed as to give the instructions, or whether he failed to understand the effect of what was done, does not appear." And at page 220: "It is not indispensable that the precise mode of committing the fraud should be proved; if the circumstances raise a legitimate presump-tion of fraud it is proper to so find, in the absence of sufficient explanation." (And see the language of EARL, J., in Rollwagen v. Rollwagen [*supra*], 521.)

It is always a suspicious circumstance, requiring satis-factory explanation, that the decedent was surrounded by those who are to benefit by the change, and makes a will radically different from that which he had recently

made. (Forman *v.* Smith, 7 *Lans.*, 443; Delafield *v.* Parish, 25 *N. Y.*, 95.)

The facts which raise a presumption against the fair and free execution of the instrument propounded, and call upon the proponent satisfactorily to explain, are,

*First.* The will ignores all the decedent's relatives, friends and associates except Mrs. Phipps, and wholly reverses his testamentary purposes, as expressed in his will of date 28th April, 1874, which disposed of his estate to his relatives, though remote, and to special friends and associates, but in which no mention of Mrs. Phipps, or any member of her family, is made; while the evidence shows that his intimacy with her family was quite as great before, and at the time of its execution, as subsequently.

*Second.* The former will contained several bequests which were made as special expressions of kindly and interested remembrances, such as to Robert Leeds, William W. Leeds, Rev. Pennamore Leeds, Daniel W. Leeds (his namesake), the sons and daughters of Mr. Richards, his mother's clothing to Mrs. Leeds, his porringer (his first present) to Mrs. Van Kleeck, his watch to Mr. Richards as a memento, he having had intimate and friendly business relations with him for many years, and particularly a $5,000 gift to Miss Van Kleeck, who had been for years a particular and admired favorite, whom he had visited, and shown marked attention and partiality, and whom he had informed of his remembrance of her in his will. This complete reversal appears to have been without any evidence of a change in his relations towards, or interest in, the several legatees, except such as is evinced by his silence respecting them in the instrument pro-

pounded ; and there appears also to have been no sug-gestion, either in the will itself or the instructions given to the attorney who drew it, or in any conversation, that he had any remembrance that he had made a prior will.

*Third.* The concededly impaired mental vigor of the decedent, at the time of the execution of the instrument offered for probate.

*Fourth.* The decedent's utter helplessness and depend-ence upon Mr. and Mrs. Phipps, and their family.

*Fifth.* The active agency of Mr. and Mrs. Phipps in procuring their own attorney to draw the will, and the witnesses who attested it.

*Sixth.* The fact that the will in question bestows all decedent's property upon a person alien to his blood and family.

What are the facts alleged in explanation of these sus-picious circumstances ?

*First.* The proof by Mr. Reed, that when he first en-tered the sick chamber and announced that he had come to draw decedent's will, the latter said, in the presence of Mr. and Mrs. Phipps, that he wished to give all his property to Mrs. Phipps ; and that after Mr. and Mrs. Phipps had, at his request, retired from the room, de-cedent adhered to his purpose, and afterwards heard the instrument read, and said it was as he wanted it.

*Second.* The testimony of Mr. and Mrs. Phipps, that the terms of the will as well as the desire to make a will, were suggested by the decedent voluntarily, and that they never attempted to influence him, either to make it, or suggested its provisions.

*Third.* That the present will was induced by the fact that

since decedent's will of 1874, was executed, the decedent's friend had become insolvent, and that the decedent in sympathy for his condition, made this bequest to his wife.

*Fourth.* That decedent made the change in his will as a reward to Mrs. Phipps, as a recognition of her services, in nursing him in his last illness.

*Fifth.* That his relatives were remote, and his feeling toward them and the legatees had changed since the execution of his former will, by reason of their neglect of him during his last illness.

*Sixth.* That some ten days after the execution of the instrument, when decedent was concededly in better mental condition, he gave, *inter vivos*, the principal part of his property to Mrs. Phipps, in money.

The answer to the first attempted explanation will be best made in the language of Judge PORTER, in Tyler *v.* Gardner (*supra*): "It is no sufficient answer to the presumption of undue influence, which results from un-disputed facts, that the testator was aware of the contents of the instrument, and assented to all its provisions. This was the precise purpose which the undue influence was employed to accomplish."

I cannot regard the voluntary statement of the decedent before being asked, that he wished to give all his property to Mrs. Phipps, as adding anything to the explanation, for it was so readily uttered that it excites the suspicion that it may have been but the expression of what had been just before suggested by the parties present, who were to be wholly benefited by the instrument about to be drawn.

These suggestions in no way implicate or cast suspicion

upon the fidelity or the fair dealing of the honorable counsel who drew the will; for wherever undue influence has been exercised over a testator, that influence has taken effect before the instructions to prepare the will, and has been carefully kept from the draftsman, with the knowledge that, if exhibited or suggested to him, it would wholly defeat the unlawful purpose.

The second point of explanation needs to be carefully considered in the light of the interest and bias of Mr. and Mrs. Phipps, as well as in conjunction with certain other facts which reflect upon the credibility of their testimony; and I think it will not be seriously contended, that without the benefit of their testimony, the presumption of undue influence will be overcome in this case; nor will the suspicious circumstances be satisfactorily explained.

Dr. Marcy testified, that when he was seeking information of Mrs. Phipps, to enable him to prescribe for the decedent, she told him that decedent's mind was not affected by his paralysis at Augusta, while all the physicians concur in stating the contrary. Dr. Ford says, that at first he was *comatose.* Dr. Campbell: "his mental faculties wholly clouded." Dr. Steiner, a witness for proponent, and who finally took the entire charge of the patient, says: "Capable of very little mental effort for the first two weeks."

Mrs. Phipps testified that the decedent could talk as well as anybody, if he was a-mind to, referring to Wednesday after the first Tuesday of April, about a week after his attack; and Mr. Phipps swears to an extended conversation with the decedent, in which he took active part, the next morning after his attack. Yet Dr.

Campbell testifies, that upon the 14th day of April decedent was unable to articulate, and Dr. Steiner, that he found decedent unable to speak, and until the last week he could scarcely speak at all, because of the paralysis of the tongue.

The third explanation seems to fall very far short of a satisfactory reason for the change in the decedent's testamentary purpose, as the evidence shows that Mr. Phipps's insolvency came to the knowledge of the decedent during the year 1873, and probably about the middle of that year, while that will bears date April 28, 1874. But if, on the evidence, there is any doubt as to the knowledge on the part of the decedent of Mr. Phipps's pecuniary embarrassment at the time of the execution of the will, yet his attention was specially called to his former will, on the 15th day of March, 1875, when he prepared special instructions addressed to his executors respecting the carrying out of his wishes, and then, in May or June in the same year, when he informed his executor, Van Kleeck, that he had made a will, and named him executor, requesting him to serve, and informed him where the will was to be found ; and later still, in December, 1875, the night before he left for the South, he said to the said executor that he might never return ; that if he did not, he would find his will and instructions as he had stated, showing quite conclusively that the pecuniary embarrassments of his friend, Mr. Phipps, was not a probable reason for his changing his will, for at that time he had certainly been in possession of all the information upon the subject ; and so far from evincing a determination or desire to change his will in the interest of that friend, he appears to have visited

him and his family just before his departure, when he was in ill health; and thereafter, the night before his departure, recalled the attention of his executor, Mr. Van Kleeck, to his instructions.

These circumstances afforded ample and apt opportunity to decedent to consider and determine upon the propriety of a change in his will, in the interest of his friend, especially as he was then contemplating the possibility of never returning.

It is quite apparent, therefore, that this motive for a change must be disregarded in the determination of this case, and the motive founded either in his changed relation to the legatees under his former will, or his desire to reward the sole beneficiary for her care and attention to him during his last illness.

In respect to the alleged change in his relations and feelings towards the legatees, there seems to be no evidence warranting such change; for it is entirely clear, that so far as any pretended neglect of the decedent on the part of Mr. Van Kleeck, Mr. Richards, Mr. Leeds or Mrs. Van Kleeck is concerned, such apparent neglect resulted from the statement given to them by Mr. or Mrs. Phipps, respecting the inability or unwillingness of the decedent to see them, except in the case of Mr. C. H. Leeds, whom, it appears, he manifested a disinclination to see in his last illness. This disinclination is in no way accounted for, and is full of suspicion, when it is considered that he made him his executor, and in the early part of the year 1875 communicated to him special instructions in respect to his will, and who testified to the continuance of his friendly relations down to the time of his visiting him at Mrs. Phipps's house. Indeed,

I have looked in vain for any explanation, in the testimony, of his apparent change of interest in his relatives and former trusted friends, unless it is to be found in the overmastering impulse to reward Mrs. Phipps for her kindly services in his last illness with his entire effects, including the clothing of his mother, and his valued keepsakes.

So far as the occurrences between Mr. Taylor, decedent, and Mrs. Phipps, relating to the payment by Mr. Taylor, to decedent, of nearly $30,000, and his gift thereof to Mrs. Phipps are concerned, it is not necessary to determine whether or not that was a valid gift, *inter vivos*, but only to consider its effect upon the question of undue influence, imputed to the sole beneficiary under the will.

On the one side it is urged that this occurred some time after the execution of the will, when decedent was concededly in better mental condition than when the will was executed, and that the gift was a confirmation of the purpose of the testator, expressed in his will, to give her the entire estate ; while, on the other hand, it is claimed to afford confirmatory evidence of the purpose and active effort of Mrs. Phipps to secure the entire estate beyond all contingency.

The fact that she wrote a letter to Mr. Taylor, that she was present when the money was paid to Mr. Ingersoll, and that, notwithstanding the will gave all the estate to her, yet that it was deemed necessary to go through the form of a personal gift and delivery, without any formal reference to the fact of the will having bestowed it upon her, are claimed to establish an appre-

hension on her part, that the will might for some reason fail to operate.

The testimony upon the subject of this gift is somewhat contradictory, and the transaction suspicious.

[The Surrogate reviewed the evidence on the point, and then proceeds.]

It is quite impossible to reconcile these different versions of that transaction, and it is left without satisfactory explanation.

It is proper to notice also that Mrs. Dodge, the nurse of decedent at Augusta, testifies that on several occasions when she returned to decedent's room, Mrs. Phipps being in charge of the decedent, she found her speaking in a low and confidential tone to the decedent, which ceased immediately on the witness's entrance to the room ; and Mr. Walker, one of the attendants at Augusta, testified that he overheard Mrs. Phipps speak to decedent upon the subject of making a will " to him" (meaning possibly Mr. Phipps) ; that decedent said, " No ;" and that she said: " You will make it to me then," and he answered, " Yes." It is proper, however, to say that Mrs. Phipps denies this positively, and yet it is a circumstance worthy of note in considering the question, as to the probable influence exercised upon decedent to procure the will in question.

Another circumstance which to my mind is very significant, is the treatment by decedent in his last illness of Mr. Leeds, his executor in his former will, and a relative. This seems entirely inexplicable except upon one of two theories—*first,* either that decedent was in such a mental condition that he was unconscious of what he was doing, or that his mind had been prejudiced against

Mr. Leeds, by some person who had access to him during his last illness, and that for an unlawful purpose; which, taken with the other evidence that Mrs. Phipps assumed to deny the friends of decedent access to him during his last illness, and appears to have had considerable influence over him, as several of the witnesses testify, certainly tends to show that the decedent may not have been acting as a free agent in the execution of the will in question.

While the recommendation and procuring of Dr. Marcy, their physician, for the decedent, and Mr. Reed, their counsel, to draw the will, do not in any way militate against the skill or integrity of these gentlemen, yet it is a circumstance to be noted on the inquiry, whether Mr. and Mrs. Phipps interfered with the decedent's wishes in that respect. For it must be remembered that his trusted physician at Augusta, Dr. Steiner, recommended him to call on Dr. Hammond on his arrival at New York, but decedent was dissuaded therefrom by Mr. Phipps.

Having considered at large several of the alleged explanations of the decedent's reversal of his testamentary purpose as expressed by his will of 1874, and reached the conclusion that none of them are satisfactory, unless found in the desire of the decedent to recognize and reward the services of Mrs. Phipps in his last illness, it seems to me proper to consider whether that motive is sufficient to overcome all the proof and circumstances pointing to the undue influence exercised upon the testator by Mrs. Phipps.

It must be conceded that there is no direct and positive evidence of such undue influence; that it must be, if

found at all, inferred from the circumstances of the case, and the helpless condition of the decedent, and his being surrounded by the influences of those who benefited by the will, and from the reversal of his former will, and such other inferences as are deducible from the facts already considered.

That decedent felt a deep sense of obligation to Mr. and Mrs. Phipps for their unwonted attention and kindness to him in his extremity, was certainly natural and praiseworthy, and if he had rewarded her by a gift of even $5,000, it would not have seriously shocked one's sense of propriety or justice. But that he should have felt that it entitled her not only to his entire fortune, but the forgetfulness on his part of all interest in his former legatees, seems to me entirely unreasonable, and to be accounted for upon some other principle than that of personal gratitude. Indeed, setting aside all the other circumstances which suggest undue influence, can it be truly said that a helpless paralytic, of enfeebled mind and will, who conceives such an extravagant sense of his obligation for eight weeks of kind and attentive nursing as to be moved to bestow his whole fortune of $45,000 as a reward for such service, was acting under a free and intelligent purpose, at a time when he must have been impressed with his utter dependence for every attention upon his sole legatee?

In considering this case, I have striven to give all due importance to the fact that decedent left no near relatives, and that his sense of obligation to relatives so remote might well be weak and comparatively insignificant; yet from the most careful consideration that I have been able to give to the evidence in this case, I have not

been able to escape the conclusion that the instrument in question was not the free expression of decedent's will. I am fully impressed with the duty of a judicial officer to respect and sustain a last will and testament whenever it shall appear that it was executed intelligently and freely, and with the danger of setting at nought the declared purpose of such a testator, on the application of an irreverent or factious contestant; but I am equally persuaded that the success of such a policy must rest upon the general approbation and respect felt for the wishes of a testator freely and rationally expressed.

The will offered should be refused probate, on the ground that it was executed under undue influence.

Ordered accordingly.