NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE —SEPTEMBER, 1876.

FAGAN v. DUGAN.

*In the matter of the last Will and Testament of* BRIDGET DUGAN, *deceased.*

To prove undue influence by duress or threats which will avoid a will it is not necessary to show that the duress was visible or physically exercised at the moment of the execution. It is enough to satisfy the mind of the court or jury, that the duress existed shortly before, and continued its domination over the mind at, the time of its execution

Such influence is usually effected by slow, adroit and covert process, manifested by numerous acts, each of which is trifling in itself, but all of which combined are potential and controlling; and it is the province of the court, from the evidence, to group and aggregate the several acts and circumstances with the opportunity and results, for the purpose of determining their effect on the testator's mind.*

---

* For recent cases on undue influence, as to requisite evidence on probate, see *Rollwagen* v. *Rollwagen*, 63 *N. Y.*, 504; affi'g 3 *Hun*, 121; S. C., 5 *Sup'm. Ct.* (*T. & C.*) 402; and in *Surr. Ct.*, 48 *How. Pr.* 289; McLaughlin v. McDevitt, 63 *N. Y.*, 213. Compare also *Baker's Will, ante,* p. 179.

THIS was a proceeding for the probate of the last will and testament of Bridget Dugan, deceased.

The will in a question bore date the 27th day of August, 1875, and the testatrix died on the 18th day of January, 1876.

The will gave and bequeathed to her son, Bernard Dugan, the lease of No. 183 Ludlow street, New York and the building thereon, with all her personal property, to discharge her indebtedness to her said son, and appointed him sole executor.

The deceased left two daughters, and three children of a deceased son, beside the son named as executor, in the will.

Hannah Fagan, one of the daughters, filed objections to the probate: that the instrument was not the will of the deceased; that the testatrix was of unsound mind, when the same was executed; that it was not executed and attested according to law; that its execution was procured by fraud, circumvention and undue influence, by Bernard Dugan, the executor, and that it was procured by fraud and coercion, by said Bernard Dugan, or some other person unknown.

ALFRED ROE, *for proponent.*

W. H. KING, *for contestant.*

THE SURROGATE.—A careful examination of the testimony of the subscribing witnesses to the will leaves no doubt upon my mind, as to the due execution of the will in question, unless it was procured by undue influence, or coercion. That question presents the only embarrassment involved in this contest; and for the purpose of its consideration, I deem it proper to state somewhat fully the facts testified to by the respective witnesses upon that subject.

Margaret Fagan, a daughter of the contestant, testi-

fied, that she was in the habit of visiting her grand-
mother frequently, and lived with her for a portion of
the time, and that she said she had not made a will;
that Barney, the son, was in the habit of quarreling with,
and beating his mother, and four days before her death
he threw a quid of tobacco in her eyes; that he threat-
ened her a dozen times that he would kill her, or be the
death of her; that he was anxious that she should make
a will in his favor; that he would get up in the night-
time and drag her out of bed; that she had seen him do
it several times; that he used to beat her; that there
were other persons occupying the house at the time, but
had moved away; that he pulled her off the chair, pulled
her cap off her head, and threw it in her face.

Ellen Haskin, one of the next of kin, testified that
she was with the deceased about two weeks before she
died, and remained over night, and that deceased told
her that she had not made a will.

Hannah Fitzgerald one of the next of kin, testified
that she saw her grandmother, the deceased, every day;
that Barney quarrelled with his mother, and that she
begged witness to stay with her, because her son would
kill her; that she had often seen him take things, and
throw at her; had seen him hit her with anything he
could get hold of; saw him drag her out of bed, when
she was sick, and she begged Miss Fagan to take her up
stairs; that he had told his mother that if she did not
leave him all she had, he would kill her; that she told
witness that Barney had hit her in the eye; that she
had stated to witness that she did not make any will;
that she had made a will some years ago, but Barney
did not like it; that she had no peace until she broke it.

Hannah Dugan, a witness produced for the contestant,
testified that Barney was quarrelsome with his mother;
that he said he was afraid she would make a will in

favor of the witness, and if she did not make a will in his favor, he would kill her; that he frequently said so; that he dragged his mother out of bed by the hair of the head, spit in her face frequently; that he upset her in a rocking chair; said he would kill her.

Joseph Husson, Esq., attorney and counsellor at law, testified that he was called upon by the deceased to draw a will for her; that he drew one, she signed it; that he retained it at her request until some years after, when she called, and said she had no peace to her unless she broke that will; that her son Barney was making such a fuss about it; that she called to get it destroyed; that she was afraid of violence unless she put it out of the way; that he drew another will for her, and called upon her to execute it; she told him that she could not possibly execute it, unless Barney was out of the way; that she was afraid to execute it, unless it was in his absence; that she was apprehensive of her life if she signed the will; that that will provided for the equal division of her property among her children and grandchildren, the grandchildren taking the share of their parent; that this was in April, 1875; that will was not executed; that the will that was executed first, made no preference among her children: the property was divided equally among them.

James Fagan testified that he lived at deceased's house several years before her death; that on one occasion, deceased requested him to take her up to witness' house, and on being asked what was the matter, she said: "Barney will be killing me about the will, if I do not make a will in his favor," and that at her request he did take her up, and she stayed with them three or four months. She told witness she had been threatened by Barney unless she would make a will in his favor, and witness had seen him attempt to strike his mother, when

he was in the house.  She told him that he struck her
after witness went out; that he had heard him threaten
her dozens of times.

Miles M. Dunton, a physician, testified in behalf of
the proponent that he attended upon the deceased but
discovered no marks of violence upon her, made no
examination; that she never complained of any to him.

Bernard Dugan, executor, and sole legatee, testified
denying all the allegations of violence, and threats; that
he had loaned his mother $1,700 that he had earned,
upon the agreement that she should pay no interest,
and that she should board and clothe him, and that she
did so.  He contradicts Mr. Husson as to the terms of
the first will, and alleges that it gave all the property to
him, except one hundred dollars to the grandchildren,
and claimed that his mother took the will away because
he had appointed him (Husson) trustee; that his mother
instructed this will to be drawn as it was, because she
owed him, and wanted to make a settlement with him,
and because she had no money to pay him.  It appears
that the testatrix was about 83 or 84 years of age when
she died.

The subscribing witness, James G. Murphy, testi-
fied that he drew the will under the direction of the
testatrix; that he was a clerk in the register's office,
and had no acquaintance with the testatrix until the
day he saw her upon the subject of this will; that he
received instructions as to the terms of the will in the
*presence of Barney Dugan, and that he was present at its
execution.*

The testimony in this case presents the most extra-
ordinary exhibition of brutality on the part of Bernard
Dugan toward his mother, if it is to be credited, and it is
certainly difficult to believe that the witnesses Margaret
Fagan, Ellen Haskin, Hannah Fitzgerald, Hannah Du-

gan, and James Fagan all testified falsely in respect to the treatment by him of his mother, more especially as a reputable attorney, Mr. Husson, was told by the testatrix that she had no peace unless she broke the will, that Barney was making such a fuss about it that she had come to destroy it; that she was afraid of violence unless she put it out of the way, and that a subsequent will, making an equal distribution of her estate was not executed after several attempts, because of the presence of her son Bernard.

Other circumstances deserving consideration are the fact that her attorney was not called upon to draw the will in question, but a stranger, and a layman; and that the testatrix had two sisters living, and the children of a deceased son, all of whom would seem to have equal claims, at least, upon her bounty; that she destroyed the first will under the circumstances and for the reason stated by her, and that she failed to execute the second will, containing similar provisions to those in the first, for the reasons stated by her to the witness Husson. It seems to me sufficiently shown that she was at these times so intimidated by the threats, and ill treatment of her son, that she was coerced into destroying it and into desisting from the execution of the second will; and the only difficulty there is in determining whether the will in question was the free act and testament of the testatrix arises from the fact that it is necessary to establish the fact of coercion and control, at the time when the will was executed.

In *Gardiner* v. *Gardiner* (34 *N. Y.*, 155), Justice DAVIES after reviewing several authorities states the results of these authorities as follows: " That undue influence to avoid a will must be such as to overcome the free agency of the testator, at the time the instrument was made; it must be a present constraint operating on the

mind of the testator at the time of the testamentary act," as to which he cites the following authorities: *Earl Sefton* v. *Hopwood*, (1 *Foster & Finl.* 578) ; *Dean* v. *Negley* (41 *Penn.*, 312) ; *Eckert* v. *Flowry* (43 *Id.*, 46.)

From an examination of the latter case—which is cited as authority for the principle that the undue influence to avoid the probate of a will must be a present constraint operating on the mind of the testator, at the time of making the testament,—it appears that testimony was given, under objection, of the acts and declarations of the testatrix after the execution of the will, also of the conduct of the person alleged to have exercised the undue influence, all subsequent to its execution, and that no evidence was produced of facts or occurrences, tending to produce undue influence or duress, previous to the execution of the will in question. It is certainly no authority in such a case as this. So in the case of *Gardiner* v. *Gardiner*, above cited, there was no evidence of any duress, or of undue influence. It only appeared that the testator was influenced by affection or esteem, to make the will that he did, and the point discussed as to the time when the influence must operate, in order to determine its effect upon the mind, was not necessarily before the court. Undue influence may be inferred from circumstances (*Marvin* v. *Marvin*, 3 *Abb. Ct. App. Dec.*, 192 ; *Lake* v. *Ranney*, 33 *Barb.*, 49).

In *Seguine* v. *Seguine*, 3 *Keyes*, 663, the head note of the case is, " undue influence must be an influence exercised by coercion, imposition or fraud, and not such as arise from gratitude, affection, or esteem, and its exertion upon every act must be proved ; it will not be inferred from opportunity, and interest," but in that case Mr. Justice WRIGHT says, " but the case is barren of evidence of any direct influence exercised to procure the will."

By the language of the various authorities that the coercion, duress or undue influence, must be a present constraint operating on the mind of the testator, in the very act of making the testament, (*McMahon* v. *Ryan*, 8 *Harris*, 329), I do not understand that to prove that the influence was present at a particular time, it necessary to show that the duress was visible, or physically exercised at the moment of the execution, but that there must be such evidence as will satisfy the mind of the court or jury, that the duress existed shortly before, and continued its domination over the mind of the testatrix at the time of execution.

To hold otherwise would render it practically impossible to defeat the probate of a will, the execution of which was procured by the undue influence of a shrewd and scheming person, for it would be apparent that any undue influence or duress, exercised at the moment of execution, in the presence of the subscribing witness, would defeat the fraudulent purpose of the party seeking to influence or coerce the testatrix.

It would be absurd to expect that such undue influence, fraud or duress, would be exerted visibly in the presence of disinterested spectators, who would be likely to reveal them, and thus defeat the unlawful scheme.

Such fraudulent results are usually attained by slow adroit, and covert processes manifested by numerous acts, each of which is trifling in itself, but which when combined are potential and controlling; and it is the province of this court, from the evidence, to group, and aggregate the several acts and circumstances, with the opportunity and results, for the purpose of determining their effect upon the testator's mind. It seems to me that the proof in this case showing the execution of a former will for the benefit of all her children by the testatrix, its destruction under threats by the

sole beneficiary of this will, his violence and threats producing such fear upon the testatrix that she dare not execute a second will making similar provisions, his repeated threats to kill her if she did not make the will and give him all of her property, and her statement of her fears of such personal injuries, all combine to establish the fact, that at the time when this will was made by the testatrix, she executed it under the duress of her son, the sole beneficiary under the same ; and this conclusion is made more probable, when we consider that she was a very old lady, infirm in health, and unprotected by any other inmate of her apartment.

Order accordingly, denying the probate on the ground of undue influence and duress.