NEW YORK COUNTY.—HON. D. C. CALVIN, SURROGATE.—
August, 1880.

## MARX v. McGLYNN.

*In the matter of the probate of the last will and testament of MARY CAROLINE MARX, deceased.*

Where the testator's mental capacity is at issue, his declarations, near the time of making the will, are admissible as part of the *res gestæ*, for the purpose of showing the state of the testator's mind, but are incompetent to prove the external facts of fraud or undue influence.

Where the testatrix kept a diary in which, besides a statement of facts and events, there were expressions of her sentiments towards her sister, the contestant, and of her interest, and fondness for the chief beneficiary under her will, *Held*, that as to these latter expressions, the memoranda of the diary were admissible as bearing upon the probability of decedent making such a will as the one propounded, if in her sound mind : but that all statements of facts tending to show the conduct of the decedent, the beneficiary, or the contestant, unless made at the time, and forming part of the transaction of the execution of the will, were incompetent.

The decedent and her two sisters, spinsters, owning, jointly, property yielding an income of about $15,000, were members of the Protestant Episcopal Church, taking an active part in the services of the church of St. Alban's. In 1869, Mr. Bradley, an assistant at St. Alban's, was a regular visitor at their house, and became the spiritual adviser of decedent. Decedent manifested great personal interest in Bradley's efforts to establish a mission and subsequently an orphanage in New York, even leaving her home to reside in the vicinity of Bradley's field of labor. Bradley was afterwards received into the Roman Catholic Church by the Rev. Dr. McGlynn, and shortly thereafter decedent was received into the same church by the same clergyman, Bradley acting as godfather. In June, 1872, decedent accompanied Bradley to Europe, where she remained until April, 1878. During this period she traveled with Bradley, or corresponded with him, always manifesting a great interest in the latter, watching over his progress as a student of the American College in Rome, and furnishing him with the means of support and education. On her return to this country in 1878, Bradley having remained abroad, decedent was introduced by Dr. McGlynn to the Lady Superior of St. Stephen's Home, whose brother, a Mr. Ryan, drew the instrument propounded, from instructions received from decedent per-

MARX *v.* M'GLYNN.

sonally, at an interview at which no third person was present. The will was executed before Ryan and the sexton of St. Stephen's Church, who both signed as witnesses. The will in question bequeathed $1,000 a year to her surviving sister during her life, and also a life-interest in the family residence and family silver ; upon the death of the sister, the house and silver to go to Mr. Bradley, to whom, also, was given all decedent's personal property in Liverpool, and all the income of decedent's estate during life, and upon his death the whole estate was to go to the Catholic Little Sisters of the Poor of the city of New York. A legacy of $1,000 was bequeathed to Dr. McGlynn, who was appointed sole executor.

*Held,* that the relations of Mr. Bradley to decedent, as her spiritual adviser, were of such an intimate character, that, had he been present at the dictation or execution of the will, or had he procured it to be made, the presumption of undue influence would arise, as he was not presumably entitled to decedent's bounty.

*Held, further,* that under the evidence in this case, there was no proof of undue influence, and that the will was valid.

The authority of the Surrogate to construe wills on probate should be exercised only as to wills of personal property. (See § 2634, *Code of Civ. Pro.*)

The will provided as follows : " It is my will that my executor, hereinafter named, pay to the Rev. Aloysius J. D. Bradley, all the income derived from my estate, after paying the necessary expenses accruing thereon." Decedent's estate consisted principally of real property. Bradley was a non-resident alien. *Held,* that an active trust to receive the rents and profits of decedent's lands, and apply them to B.'s use during his life, was conferred upon the executor under subd. 3, section 55, 2 *R. S.*, 1106 (6 ed.) ; that such a trust could be created for the benefit of a non-resident alien, and that the beneficiary took no interest in the land.

Where evidence is given in a case without objection, and it afterwards appears to be merely hearsay, though no motion be made to strike it out, the facts established by such evidence cannot be regarded as proved, especially where the evidence was taken before a referee, and objection to such evidence was first taken before the Surrogate on its submission.

Proceeding for probate of the last will and testament of Mary Caroline Marx, deceased.

The paper propounded, dated May 23, 1878, bequeathed to Catharine H. Marx, testator's only next-of-kin, $1,000 a year during her life, together with her clothing, and her interest in premises No. 122 East Fortieth street, and her share of the "family silver" during the life of said

Catharine; after her death, the share of the house and silver to go to the Rev. Aloysius J. D. Bradley; and she also bequeathed to the Rev. Edward McGlynn, $1,000; also to said Bradley all her personal property in a storage house in Liverpool, England, and all the income derived from her estate, after paying the necessary expenses accruing therein; and after the death of said Bradley, she gives and bequeaths to the Roman Catholic Little Sisters of the Poor of the city of New York all the rest, residue, and remainder of her estate for their use forever, and appoints Dr. McGlynn executor, with full power to convey, &c.

Catharine H. Marx, a sister and only heir-at-law and next-of-kin of the decedent, filed objections to the probate of the will, and contested the validity of the dispositions of the real and personal estate, and called in question the construction and legal effect of such dispositions, and stated the following reasons: *First.* That the paper was not the will of decedent, and that its execution was not free, unconstrained, or voluntary. *Second.* That it was not subscribed, acknowledged, or attested according to law. *Third.* That decedent was not of sound mind. *Fourth.* That the instrument was invalid and void, on the grounds: (1) That the real property attempted to be devised to Bradley was void, as Bradley was a non-resident alien and not authorized to hold real estate, and not a citizen of the United States at the death of decedent; and that there is no such person as Aloysius J. D. Bradley, or entitled to the name or property. (2) That there is no sufficient disposition of the property called "the family silver," and that the clause is indefinite and uncertain. (3) That there is no

sufficient description of the property by the term "all my personal property now in a storage house in Liverpool, England." (4) That there was no sufficient disposition of any real property, or possession thereof, except "the house and lot" known as No. 122 East Fortieth street, in the life-time of the contestant, during the life of Bradley, and that no person is named as entitled thereto meanwhile. (5) That there is no power conferred on the executors to collect or receive the income of any real estate of the decedent, excepting the premises No. 122 East Fortieth street. (6) That the "Roman Catholic Little Sisters of the Poor" is not a corporate body, or capable of taking real estate by will. (7) That there is no such corporation in being having that corporate name, and the property thus attempted to be devised to them, if valid, is of greater value and larger income than it would be lawful for them to receive, in addition to other property, under the laws of this state. (8) That if such devise were valid, and the corporation entitled to receive the property thus attempted to be devised, it would be of greater value and larger income than authorized by the laws of this State, in addition to its other property. (9) That the said "Little Sisters of the Poor," a corporation intended, if any exist, was not at the time of the death of the decedent, or at any time prior thereto, authorized to take by devise. (10) That there is more than one society known by that name, and the instrument does not designate which is intended. (11) That the provision in behalf of said alleged corporations is invalid, because the instrument was not made and executed at least two months before the death of the testatrix.

The court overruled the objections, and decreed probate of the will, and the validity of the trust of personal property contained in the third clause of the will.

EDWARD MITCHELL, *and* CHARLES MATTHEWS, *for proponents.*

TOWNSEND WANDELL, *and* ELBRIDGE T. GERRY, *for contestants.*

THE SURROGATE.—[After a statement of the testimony.] —No question is raised as to the sufficiency of the proof of the execution of the instrument propounded, nor is there any doubt upon the evidence as to the soundness of decedent's mind, though some testimony is given by the contestant, of her strange conduct just before the execution of the instrument; but her intelligent and coherent letters of May 29 and June 11, after its execution, and the proof of the subscribing witnesses, are sufficient to overcome the statements of the contestant in that particular, and I entertain no doubt that she was, at the time she executed the will, of sound and disposing mind, sufficient to enable her to make her will, unless she was controlled unduly.

This brings me to the consideration of the objection to the probate, that its execution was not free, unconstrained, or voluntary. But before considering that question on the evidence, it becomes necessary to determine what portion of the testimony contained in the several memorandum books or diaries is admissible, and upon what branches of the case. I entertain no doubt that on the question of mental capacity, being the emanation of the decedent's own mind, they are all admissible, though they are quite too remote for any marked effect upon the case.

I am equally clear that all the expressions in these memoranda tending to show her sentiments towards her sister, the contestant, her conduct respecting the will of the deceased sister Emma, and her interest and fondness for Mr. Bradley, are competent evidence in the case, as reflecting upon the probability of decedent making such a will as is propounded, if in her sound mind.

But I am, equally clear in the opinion that any statement of fact upon any subject, whether tending to show the conduct of the decedent, or Mr. Bradley, or of the contestant, other than those above stated, must be held to be hearsay, and, therefore, incompetent, except such as were made at the time and formed part of the transaction of the execution of the instrument propounded ; in other words, these declarations would form a part of the *res gestæ*.

In the case of La Bau v. Vanderbilt (3 *Redf.*, 384), I had occasion to review a large number of authorities upon a question akin to this, to wit : as to the admissibility of declarations made by the decedent after the execution of his will ; and I reached the conclusion that no declarations by the testator subsequent to the execution of the will propounded were admissible in evidence, except it satisfactorily appeared to the court that these declarations reflected upon his mental condition at the time when he executed the instrument.

In Stephens v. Van Clief (5 *Wash. C. C.* 265), WASHINGTON, J., says : "The declarations of a party to a deed or will, whether prior or subsequent to its execution, are nothing more than hearsay evidence, and nothing could be more dangerous than its admission, either to

control the construction of the instrument or support or destroy its validity."

Redfield (1 *Law of Wills*, 553), after a careful consideration of the numerous authorities, states that the declarations of a testator near the time of making a will, so as to be regarded as part of the transaction, should be received upon the principles of evidence, as part of the *res gestæ*. On the other hand, mere naked declarations of the testator, made so remote from the time of execution as not to form part of the *res gestæ*, to the effect that attempts at fraud or under influence had been made, or had compelled him to make a will contrary to his real purpose and intent, seem wholly inadmissible upon recognized principles of evidence ; and after considering the leading case in this state, of Waterman *v.* Whiting (11 *N. Y.*, 157), and stating the rule enunciated by that decision, the learned author, at page 556, says : " It is here very justly said, that where the issue involves no question of mental capacity, declarations of the testator are not receivable. But as few cases of this kind arise in the courts where some such question is not involved, such declarations must generally be received for the purpose of showing the state of the testator's mind as part of the *res gestæ ;* although not entitled to have any weight in proving external acts either of fraud or undue influence ;" and in speaking, at p. 557, of the different elements going to create undue influence, he says : " They consist partly of extraneous acts and partly of the effect produced upon the mind of the testator by such acts. Both are equally indispensable to be established by competent evidence ; the former (extraneous acts) can only be proved by evidence independent of the

testator's declarations, the latter (the effect produced upon the mind of the testator) are incapable of any satisfactory proof, except by means of such declarations." I do not deem it necessary in this case to elaborate this point, for the reason .that the only significance of the various facts stated in the memoranda of the decedent, given in evidence, which relate to the issue in this case, is, that they tend to show the intimate relation between the decedent and the legatee Bradley, and her interest in and fondness for him, as reflecting upon that relation, the advancement of moneys for his expenses and support, and, perhaps inferentially, her somewhat extravagant interest and affection for the Roman Church, all of which, if clearly proved, would not materially affect my views of the case.

The facts in this case may be briefly stated as follows :

The decedent, the contestant, and their sister, Emma, were owners of property jointly, yielding an annual income of about $15,000, all three of whom were members of the Protestant Episcopal Church, and attendants on St. Alban's Church, in East Forty-seventh street, in this city, commonly denominated a ritual church. Some time in the year 1869, Mr. Bradley came to this country, and rendered some temporary assistance at St. Alban's in the absence of the rector, he having been, in June, 1867, ordained deacon of the Church of England, as Joshua Dodgson Bradley, and on the same day, as Joshua Dodgson Bradley, licensed to assist as curate at St. Alban's, Holborn, and in June, 1868, was ordained priest, as Joshua Dodgson Bradley ; and in the will he is named the Rev. Aloysius J. D. Bradley, and his petition to intervene in this proceeding is signed John

Dodgson Aloysius Bradley, and he is addressed by decedent as the Rev. Lewis J. D. Bradley, and also the Rev. Luigi D. Bradley; he was a native of Great Britain, and he has never become a citizen of the United States.

Soon after his arrival from England, he made the acquaintance of decedent and her sister, and was licensed by Bishop Potter, of this diocese, to preach. He was invited to dine with the sisters by decedent, with the assistant of St. Alban's, Mr. Noyes, and thereafter continued to visit with some regularity at the house, but appeared to be more attentive to the decedent, and more courteously received by her, than the other sisters.

Late in the year 1869, he contemplated starting a mission for poor people in the eastern part of the city, and obtained some subscriptions therefor, the sisters in question having subscribed; but late in December of that year, without starting the mission, he returned to Europe, the decedent going to the steamer to see him off.

It appears that decedent was greatly attached to St. Alban's and its services, and took an active personal interest in it, and served in some capacity about the altar. The following May, Mr. Bradley returned, and called upon decedent, and was, from time to time, entertained by the sisters. The intimacy between decedent and Mr. Bradley increased, they attending different churches together at this time; the memoranda of the decedent indicates her interest in the Reverend Mr. Noyes, to whom she had theretofore been greatly attached.

Mr. Bradley abandoned the mission on the east side,

and decided to open an oratory in Broadway, and established it in September, 1870, between Thirty-fourth and Thirty-fifth streets, and decedent attending the first service, the oratory being dissimilar to an Episcopal church, but having some indications of a Romish church. Under date of December 27, 1870, is an entry in decedent's memorandum-book, which the contestant claims indicates that Mr. Bradley received the confessions of the decedent, to which he seems to attach considerable importance; the entry is in these words: "Primus confiteur. Fr. B. speed me on my way. Dominus vobiscum." The decedent joined Mr. Bradley at the oratory and spent much of her time there, rendering some services connected with the mission, apparently having abandoned St. Alban's, and devoting much of her time to the oratory, away from her home and her sisters, and changed her dress to black.

Her sister, the contestant, remonstrated with her, but with no effect. Decedent used to teach in the Sunday-school.

The oratory did not succeed, and Mr. Bradley removed to West Forty-third street, and decedent accompanied him, and occupied a room near that used for the mission.

This new mission was called the Orphanage, where decedent remained until December, 1871, when she became sick and was taken home by contestant. Mr. Bradley called to see her while sick. Before she fully recovered, she returned to the Orphanage, when she was informed by Mr. Bradley that he was going to join the Roman Catholic Church, and in January, 1872, he made the announcement in a sermon preached at the Orphanage, at which the decedent was present.

His license was revoked by Bishop Potter, and Mr. Bradley was received into the Roman Catholic Church by the Rev. Dr. McGlynn, in this city, the decedent being present ; and on February 7, 1872, she was received into the same church by the same clergyman, Bradley acting as godfather.

For some time thereafter decedent remained at home. Mr. Bradley called frequently upon her, and, on June 29, she departed in the same steamer with Bradley, having announced to her sister, a few days before, her intention to sail with a professor and his family. She was attended to the steamer by Mr. Bradley and some Catholic priests of the city, and just before the departure of the steamer, she reached there in time to bid farewell to her sister, who had gone to the steamer to see her off. Decedent remained abroad from that time until April, 1878, nearly six years, corresponding frequently with her sisters, and receiving remittances from home ; and her diary professes to give account of the manner in which she spent her time, traveling sometimes with Mr. Bradley, after residing with and visiting and corresponding with his family in England, and continuing the correspondence with Mr. Bradley when they were separated. She spoke of Mr. Bradley's father, mother, and sister, with great interest and affection, and almost daily made some memorandum of her correspondence with Mr. Bradley, describes their travels through Europe, their visit to Rome, and other cities and countries ; their attendance upon the Romish Church, and describes the services, the entrance of Mr. Bradley as a student in theology of the American College at Rome, his progress and his final ordination, using in her memorandum, and

in her letters, very endearing terms respecting Mr. Bradley, calling him by various nicknames, writing to him as her dearest nephew, and expressed her great gratification at the progress he made in his studies; after his ordination and his success, evincing an extraordinary interest in him, furnishing him the means of support and education, and often speaking in glowing terms of the services and music in the Catholic churches abroad, sometimes disparagingly of the services to which she had been accustomed at St. Alban's, and of the clergyman there, and expressing an anxiety that her sister might consent to live abroad and become a Catholic. This relation seemed to have continued down to the year 1878, when she heard of the illness of her sister Emma, but was dissuaded from returning in consequence of the inclemency of the season, and remained until she heard of the death of her sister, and also heard of the will of Emma, in which she gave all her property to the contestant, making an allusion to decedent, that she would understand the reasons for her being ignored. She took great offense at this and expressed herself very strongly; made preparations for her return; she procured a man by the name of Bradley, who, however, does not appear to have any connection with the legatee, to draw a will, the terms of which, according to her letter, appear to differ somewhat from the paper offered for probate, and which presumably was to meet the exigency of her perishing at sea.

On her return, she very soon spoke to contestant, with reference to the will of her sister, deceased, and charged her, and other persons connected with St.

Alban's, with interfering with her sister Emma, and inducing her to execute her will as she did. She communicated, soon after her return, with Mr. Bradley, who remained in Liverpool, making certain allusions to the will of her deceased sister, and accordingly the papers were drawn by Mr. Wandell, and the matter adjusted.

In her letters she made some allusion to calling on Dr. McGlynn, and his introduction to the Lady Superior, who had a brother by the name of Ryan, whom she subsequently procured to draw her will, and who became one of the subscribing witnesses. Mr. Ryan was spoken to by his sister, the Lady Superior, who made an engagement for him to meet the decedent at St. Stephen's Home, where the will was subsequently executed.

After its execution, she wrote to Mr. Bradley, stating that the will business was finished to her satisfaction, and in the hands of Mr. Ryan, a lawyer, giving Bradley the office number of said Ryan, and stating that she had remembered her sister, as she had behaved handsomely about Emma's will, stating that when she had time she would send him a copy of her will, as the one drawn in Liverpool was not of any use, as he could not inherit the property, but only receive the income ; it had better be destroyed, for the one here was different in other respects ; asking Mr. Bradley to communicate with Mr. Bradley who drew the will in Liverpool. Decedent also informed him that she had named Dr. McGlynn as executor. Afterwards she had received information from her lawyer at Liverpool, that he had destroyed the will executed there according to her instructions. On October

31, 1878, a letter was written by Mr. Bradley to the contestant, after decedent's death, and of a very formal and discourteous manner, asking her to return his letters sent to decedent, and to understand that decedent's property left in England in his keeping was for his use, and he had no intention of parting with it. The evidence shows that after decedent went to the oratory with Mr. Bradley, she subsequently joined the Roman Catholic Church and joined him in traveling in Europe ; that she was considerably changed in her tastes and manner of life, but it is not pretended, by the contestant or her counsel, or justified by any of the testimony, that, in her long intercourse with Mr. Bradley, there was anything more than a strange and unusual fondness for him, and that he accepted her gifts, attention and money, with reasonable expression of thanks ; evincing a strong interest on her part in Mr. Bradley, and especial anxiety for his success and welfare ; and she showed a good deal of enthusiasm in her admiration of the Romish Church, and its services and appointments.

It is claimed, on the part of the learned counsel for the contestant, that all this attention, the renunciation of the Episcopal Church, and the entrance into the Roman Catholic Church, and influencing the decedent to follow him, and to go to Europe and reside abroad with him, were all concerted designs to acquire mastery over her mind, and the ultimate disposition of her property in his favor, and that the circumstances of her return after the execution of a will in Liverpool, and her execution of the present instrument and its terms, indicated and established Bradley's influence over her mind and will, and that that influence was continued through the

instrumentality of Dr. McGlynn and the Lady Superior,
after she had reached this country, and that therefore it
was not her will, but that of Mr. Bradley, Dr. McGlynn
acting for him, and the Roman Catholic Church.

The circumstances relating to the consultation of coun-
sel and the drawing of the will by Mr. Ryan, the attor-
ney, as proved by him, are substantially as follows:

That in the early part of May he received a letter from
his sister, the Lady Superior of St. Stephen's Home, a
Roman Catholic institution, requesting him to call at the
" Home," but that there was no statement in the note as
to any matter of business; and that, in pursuance of the
invitation, he did call, and after waiting a few moments
the decedent came in, and she was introduced to him by
his sister, who left the room immediately; and he was
then informed by decedent that she desired him to draw
her will, and received her instructions, of which he made
a memorandum in writing, and that his sister came in
after he had taken the memorandum and was about de-
parting; that when he saw his sister on his first call she
informed him that the decedent wished him to draw her
will and to make an appointment to meet her, which he
did, and called accordingly, when he met decedent and
received her instructions, as above stated; that his sister
said nothing as to the terms of the will, and only in-
quired if it had been made, after it had been executed;
that decedent spoke to him about Mr. Wandell being
the attorney for the family; that a few days after taking
her instructions he submitted a draft to her, at the
Home, and she took it away, and afterwards he heard
that she wanted it altered; and after it had been
changed according to her wishes, it was executed before

him and the sexton of St. Stephen's Church as witnesses; that he suggested to decedent the last clause of the will, and explained the reason for it.

This is all the testimony tending to show undue influence exerted over the mind of the testatrix, at the time of the preparation or execution of the instrument, either by Dr. McGlynn, the Lady Superior, or the attorney, Mr. Ryan ; although in her letters to Mr. Bradley about that time she refers to a visit to Dr. McGlynn, and receiving a letter from him to the Lady Superior, and of consulting a lawyer recommended by Dr. McGlynn, who had advised her to make a new will ; and she alluded to the fact that Bradley could not inherit the property, but only receive the income ; and that she desired the will, under the advice of her attorney, made in Liverpool, to be destroyed. But in respect to these latter statements, under the authorities above cited, I am entirely clear in the opinion that the facts alleged in her letters are not proved, and that there is nothing in this case justifying the finding that decedent ever executed a will in Liverpool, or that she ever received the letter from Dr. McGlynn to the Lady Superior, or that Dr. McGlynn ever recommended Mr. Ryan as a lawyer, for they are mere statements of the decedent, not otherwise proved, and are competent only for the purpose above stated. There is nothing in the testimony given by Mr. Ryan, amounting to a rational suspicion that any one benefited by the terms of the will was present, either at the dictation of its provisions by the decedent or its execution, or participated in any way in procuring the attorney who drew the will, or its execution ; nor is there the slightest evidence that either Dr. McGlynn, the Lady Superior,

or Mr. Ryan ever had any communication upon the sub-
ject of the will with Mr. Bradley, or that either assumed
to act in the transaction in behalf of either of the
legatees named therein ; and if any undue influence is to
be deduced from the fact that the testatrix, for years a
member of the Roman Catholic Church, was recom-
mended by the Sister Superior of a charitable organiza-
tion, which takes nothing by the will, to a brother, as an
attorney competent to draw her will, because he was
also a member of the same church, would seem to in-
volve the exclusion of an attorney from drawing a will,
to be executed by a testator of the same religious faith as
himself, whenever a clergyman of the same church or any
charitable or ecclesiastical organization was to be bene-
fited. Some assumption of undue influence is indulged
in by the contestant's counsel, from the fact that Mr.
Wandell, who had been the attorney of the family, and
who drew the will of the deceased sister Emma, and
drew the papers restoring a share of that deceased
sister's property to the decedent, was not employed to
draw the will offered for probate ; but the significance of
that fact is greatly weakened, if not wholly explained,
when it is remembered that the will drawn by Mr. Wan-
dell, of the sister Emma, was the subject of great dis-
satisfaction on the part of the decedent, and that she
became greatly incensed in consequence of its terms ;
besides, the decedent knew that he was the attorney of
the contestant, and that she was greatly prejudiced, not
only against Mr. Bradley, but the Roman Church, and
an unwillingness to employ Mr. Wandell under those
circumstances was perfectly natural.

In reaching the conclusion that the facts stated in the

memorandum-books written by decedent, and her several letters to her sister and to Mr. Bradley, are not admissible as being merely hearsay, I have not lost sight of the fact that the letters appear not to have been objected to when given in evidence ; but when evidence is given in a case, and it afterwards appears to be merely hearsay, though no motion be made to strike it out, the facts which are the subject of mere hearsay evidence cannot be regarded as proved, especially in this case, where the evidence was taken before a referee and submitted to the court, and the objections were first taken on such submission. I am disposed to treat the written memoranda and statements or declarations of the decedent as of no higher verity than would have been her verbal declarations to the same effect.

This brings me to the inquiry whether the testimony warrants the conclusion that the instrument propounded was produced by the undue influence of Mr. Bradley, exercised over the mind of the testatrix.

The influence or importunity which will avoid a will must be such as to deprive the testator at the time of the free exercise of his will, whereby the instrument becomes the will of another mind, rather than that of the testator, and such undue influence must have been exercised in respect to the very act, and the act must be proved, and will not be inferred from opportunity and interest. (Gardner v. Gardiner, 34 N. Y., 155; Seguine v. Seguine, 4 Abb. Ct. App. Dec., 191 ; Kenny v. Johnson, 60 Barb., 69 ; Cudney v. Cudney, 58 N. Y., 148.)

In Deas v. Wandell (3 Sup'm. Ct. [T. & C.], 128), it was held, that the circumstance that the testatrix's will gave all of her property to persons not related to her,

did not raise the inference of a want of mental capacity or of undue influence ; and in Cudney *v.* Cudney, above cited, the Court of Appeals fully sustained the doctrine, that to invalidate a will on the ground of undue influence, there must be affirmative evidence of the facts from which such influence is to be inferred. It is not sufficient to show that a party benefited by a will had the motive and opportunity to exert such influence ; there must be evidence that he did exert it, and so control the action of the testator, either by importunities which he could not resist, or by deception, fraud, or other improper means, that the instrument was not really the will of the testator ; but it was held that the character of the provisions of the will might be considered in connection with the other evidence in trying the question of undue influence, but was not in itself evidence of such influence ; that, however partial or unjust a testator may seem to have been in his testamentary dispositions, if the instrument propounded was clearly his will, effect must be given to it.

In Children's Aid Society *v.* Loveridge (70 *N. Y.,* 388), it was held, that to avoid a will upon the ground of undue influence, it must be shown that the influence exercised amounted to moral coercion, which restrained independent action and destroyed free agency, or that by importunity which he was unable to resist, the testator was constrained to do that which was against his free will and desire.

Judge REDFIELD (*American Cases upon the Law of Wills*, page 472, note), says : " We may safely say that where an unjust will is produced by deception and fraud, it cannot be upheld ; so, too, where such will is the off-

spring of an influence brought to bear upon the testator in any manner, so as to overcome his free agency, it cannot be sustained by law. It is often said in the cases that influences resulting from love, duty, and affection will not be regarded as unlawful, but we have never known a case where a man, by kindness and influence, was coerced to the extent of producing an unjust will, more through the agency of the principal beneficiaries than of the testator, that it could be upheld in a court of justice." And in *Jarman on Wills*, at page 36, that learned author says : "The amount of undue influence which will be sufficient to invalidate a will must, of course, vary with the strength and weakness of the mind of the testator. But the influence which will vitiate a will must be such as in some degree to destroy the free agency of the testator, and constrain him to do what is against his will, but what he is unable to refuse, or too weak to resist."

In Rollwagen *v.* Rollwagen (63 *N. Y.*, 504), Judge EARL, at page 519, says : "The influence exercised over a testator, which the law regards as undue or illegal, must be such as to destroy his free agency, but, no matter how little the influence, if the free agency is destoyed, it vitiates the act which is the result of it." But when it is held in Seguine *v.* Seguine, and Deas *v.* Wandell, Cudney *v.* Cudney, and other cases above cited, that there must be evidence that the person, having the motive and opportunity to exercise undue influence, did so, it is not to be understood that there must be direct evidence of such undue influence ; for in Fagan *v.* Dugan (2 *Redf.*, 341), I reached the conclusion that to prove the exercise of undue influence at the particular time of the

execution of the instrument, it was not necessary to show that the duress was visible, or physically exercised at the moment of the execution, but that there must be such evidence as would satisfy the court or jury that the duress existed shortly before, and continued its dominion over the mind of the testatrix at the time of the execution of the will; that such influence was usually effected by slow, adroit, and covert processes, manifested by numerous acts, each of which might be trifling in itself, but which, when combined, were sufficient to convince the mind of the existence of fraud. In Marvin *v.* Marvin (3 *Abb. Ct. App. Dec.*, 192), it was held that undue influence in the making of a will might be inferred from circumstances. In Reynolds *v.* Root (62 *Barb.*, 253), Mr. Justice MILLER says : " It is conceded that direct evidence of undue influence is not necessary ; it may be, and most frequently is, a legitimate inference from other facts and circumstances of the case." (See Forman *v.* Smith, 7 *Lans.*, 443.) In Rollwagen *v.* Rollwagen, above cited, Judge RAPALLO says : " Undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator, nature of the will, his family relations, the condition of his health and mind, dependency upon, and subjection to, the control of the person supposed to have wielded the influence, the opportunity and disposition of the person to wield it, and the acts and declaration of such person," citing numerous authorities.

From a careful consideration of all the testimony in this case, it is quite apparent that soon after Mr. Bradley made the acquaintance of the decedent, down to the time when she left England for home, he exercised,

consciously or unconsciously, a very great influence over the decedent, and it may be fairly presumed that, either from a strange infatuation, or from the direct influence of Mr. Bradley, she changed her Christian faith and practices, and separated herself from her home, family, and country, and became greatly attached to the Romish faith and ritual, and treated Mr Bradley with all the evidences of interest and affection which a devoted mother could have extended to a favorite child, and that he occupied for a considerable time the position of her spiritual adviser and pastor; in short, the relations were of such an intimate character that, had he been present at the execution of the will or its dictation, or participated in any way in the procuring it to be made and executed, the law would raise the presumption of undue influence exercised by him, inasmuch as he was not her relative or presumably entitled to her bounty.

In Sears *v.* Shafer (6 *N. Y.*, 268), it is said that in some cases undue influence will be inferred by the nature of the transaction, and the exercise of occasional or habitual influence, citing several authorities; and in Tyler *v.* Gardiner (35 *N. Y.*, 559) it is stated, that when the beneficiary is the active agent in procuring the execution, by one *in extremis*, of an instrument disturbing dispositions previously settled, and where the transaction is surrounded by the usual *indicia* of undue influence, he is called upon to show that the inducements which confessedly led to the change were not unfounded and illusory; and at page 595, Judge PORTER says: "It is no sufficient answer to the presumption of undue influence, which results from the undisputed facts, that the testatrix was aware of the contents of the instrument

and assented to all its provisions. This was the precise purpose which the undue influence was employed to accomplish ;" and he quotes with approbation the language of Lord ELDON (14 *Ves.*, 299), as follows : "The question is not whether she knew what she was doing, had done, or purposed to do, but how the intention was produced."

In Nesbit *v.* Lockman (34 *N. Y.*, 167), Judge HUNT said : "Where persons standing in a confidential relation make bargains with, or receive benefits from, the persons for whom they were counsel, attorney, agent or trustee, the transaction is scrutinized with the extremest vigilance, and regarded with the utmost jealousy. The clearest evidence is required that there was no fraud, influence, or mistake ; that the transaction was perfectly understood by the weaker party, and usually evidence is required that a third and disinterested person advised such party as to his rights. The presumption is that the propriety of the transaction, and the *onus* of establishing the gift or bargain to have been fair, voluntary, and well understood, rests upon the party claiming, and this in addition to the evidence to be derived from the execution of the instrument conveying or assigning the property ;" but he proceeds to review the several authorities, and arrives at the conclusion, "that while a bargain between attorney and client, or principal and agent, is viewed with great jealousy and suspicion, and its entire fairness must be shown by the party claiming the benefit of it, there is no inexorable rule pronouncing its illegality." In the case of Ingersoll *v.* Phipps (*ante*, p. 99), I had occasion to review most of the authorities upon this subject, and concluded that where a paralyzed

testator in his last and fatal illness executed a will, ignoring all his relatives, though remote, whom he had provided for by a former will executed in good health, wholly in favor of the wife of a friend who had taken charge of him and taken him to her house while paralyzed, procured her physician to attend him and her attorney to draw the will, he being entirely helpless, —these facts raised such a presumption against the validity of the will as to require clear and satisfactory evidence not only that the decedent understood the provisions of the will, but that its procurement and execution were fairly conducted and free from imposition and undue influence.

I have stated the circumstances under which, if Mr. Bradley had been present, and had participated in the making and execution of the will propounded, a presumption of undue influence against its validity would be indulged in ; but as he was in Europe, thousands of miles away, and could not then have exerted any active, controlling, or persuasive influence upon the mind of the decedent, except such as resulted from their long continued and confidential intimacy, and the great partiality which she had manifested for him, and doubtless felt at the time of the execution of the instrument,—the entirely novel question is raised as to the indulgence of any presumption of undue influence from the terms of the will.

We have already seen that intelligent persuasion may be addressed to a testator in behalf of a person seeking a benefit by his will, or in behalf of charitable or religious institutions, without any imputation of improper influence, and that if the intelligent mind of the testator

shall acquiesce in the cogency of the reasons without losing his mental volition, the will will stand.

Now, a view of all the testimony in this case fails to show to my mind that the decedent, in all the intercourse with Mr. Bradley, however questionable as to its propriety in the eyes of society, ever yielded her opinion or will to Mr. Bradley, in the sense contemplated by the law of undue influence. It is quite clear that the decedent was a person who was easily influenced by the ornate ritualism of the Roman Catholic Church; indeed, her early devotion at the St. Alban's Church afforded sufficient evidence of that fact; but I am not warranted by any adjudicated cases, nor the opinion of an enlightened public, in holding that that indicates even a weakness of mental powers, nor am I able to see that her change of religious faith affords any reliable evidence of any mental alienation or impairment.

This litigation, perhaps unconsciously, has been intensified by an element of religious prejudice and intolerance, which, in its unrestrained supremacy, tramples relentlessly upon law, justice, and logic, and would run riot over precedents, principles and convictions; indeed, if there is any passion of unregenerate, fallen humanity calculated more than any other to unsettle the judgment and to pollute the streams of judicial impartiality, and undermine even the social fabric, it is the indulgence of religious prejudice, bigotry, and controversy, and it is always to be regretted when it forms a constituent element of legal adjudication.

It should be remembered that the doctrine of presumption of undue influence has arisen from what is denominated the execution of undutiful wills, and

it seems to me that where the circumstances of the parties claiming to be entitled to the property of the decedent, and those benefited by the terms of the will (if admitted) are considered, it is hardly fair to say that this will comes within that definition.

The decedent and the contestant were at its execution spinsters of advanced years, and it does not appear that either of them had near relatives, who might justly claim a share of their property. They were entitled to property yielding an income of about $15,000 a year, and half of which was ample for the respectable maintenance of either. They entertained different religious views, and were members of different church organizations, and some feelings of hostility had mutually resulted from that fact, and the will of their deceased sister had increased that difference.

The decedent had an enthusiastic fondness for the Roman Catholic Church and for Mr. Bradley, a pastor, and when she made the provision that she did for the contestant she might well have supposed that she had made all the provision for her support and maintenance for the remainder of her years that was needful and proper ; and if she was as devoted a Catholic as she professed to be, it was not unreasonable that she should manifest her interest in the charitable work of that church in her native city, as naturally she expected the contestant would do at her decease in behalf of the church and its charitable work to which she belonged. Judge REDFIELD, at page 526, in the first volume of his treatise, says, " That it must always have considerable weight in favor of the validity of a will, where the testator lived many years after its

execution, and was confessedly relieved from the influence of the alleged infirmity of mind or defect of freedom by which it is attempted to be set aside without making alteration in, or revoking the same. For it is a proper inquiry in regard to undue influence, whether it operated as part of the transaction of making the will in question, and as that is an act always ambulatory during the life of the testator, his conduct after its execution is entitled to some weight in determining its validity."

It seems to me proper to consider the fact that the decedent executed the will offered for probate when undue influence exercised by Mr. Bradley, then in Liverpool, seemed improbable, and that such a separation was more significant of free agency, than any lapse of time after its execution, and opportunity to change the will, free from the influences alleged.

Whatever may be said as to the means used or the influence exerted to induce decedent to leave the Protestant Church and embrace the Roman Catholic faith, it must be quite evident that, having remained a member of the latter church seven or eight years, she must have emerged from Mr. Bradley's influence, if originally exerted, and become a free agent, capable of exercising her own volition, especially as for a considerable period she was separated from him by a long distance. It is also worthy of observation that the decedent in all her numerous letters and diaries makes no suggestion of an effort on the part of Mr. Bradley to induce her to do or omit to do anything against her will or preference.

The history of the decedent's following him to the ora-

tory and services there, and subsequently to the orphanage, and her residence near there, and services therein, and thence to the Roman Catholic Church and communion, her departure for Europe, and her sojourn and travels there, seem to me quite as well explained upon the assumption that she was moved thereto by her own caprice or preference, as that such conduct was the result of Mr. Bradley's persuasion, however much the latter might fall short of legal evidence of undue persuasion; for any such persuasion which is based upon plausible reasons, and which convinces the mind, and controls the conduct,· but which does not dominate the will so as to amount to moral coercion, leaving the mind to its own conscious choice, does not amount to legal undue influence, and in no substantial manner trenches upon the free agency of the person thus influenced, or impugns the unrestrained expression and exercise of her independent purpose and will.

· I am not unmindful of the fact that the relation of priest and communicant, and, if you please, that of the confessional, is one of peculiar significance.  Confidence affords a very easy and apt opportunity for the exercise of influence, and doubtless none more potential than the Roman Catholic communion; and hence, if such a priest should appear to have participated in such a will, or its preparation, which substantially conferred a personal benefit upon him, to the exclusion of the next-of-kin, presumably entitled to the bounty of the decedent, I should not hesitate to hold that there would arise from these facts and relation a presumption of undue influence, requiring a clear and satisfactory explanation, consistent

with the unbiased exercise of the decedent's will and purpose.

But I am of the opinion that such a presumption would not arise in a case where but a portion of testator's fortune was given to a church or charitable person, even where the priest belonged to the church by which the charitable or church objects are fostered, for the reason that it is regarded by all intelligent persons, as one of the duties of a Christian minister zealously to present the claims of such establishments upon the liberality of his parishioners during their life, and at their decease upon their generous testamentary remembrance; and if such provision be not to the substantial deprivation of the next-of-kin having reasonable claims upon his bounty, it would raise no such presumption, but the contestant would be charged with the duty of proving such facts as would establish an improper influence exerted upon the mind of the testator. Hence I conclude that the mere fact that the decedent became a convert to the Roman Catholic Church under the ministerial influences of Mr. Bradley, and continued an enthusiastic and devout worshiper in that faith, and made some of its charitable institutions, and a favorite priest therein, towards whom she had contracted an enthusiastic and demonstrative fondness, and another in whose church and by whom she was admitted to the new communion, the objects of her testamentary bounty,—raises no such suspicion as to the constrained testamentary purpose of the decedent, as to amount to undue influence as a matter of law.

But in reaching this conclusion I do not deem it necessary to pass upon the good taste or propriety of Mr.

Bradley's utilizing his inexplicable fondness for the decedent, who seems to have been old enough to have occupied the relation of mother, rather than of lover.

I am, therefore, of the opinion that the instrument propounded as the last will and testament of the decedent, is shown to have been duly executed according to law, when the decedent was of sound and disposing mind; and that the same was executed free from any undue influence, and should therefore be admitted as a will of real and personal estate.

Under section 11 of chapter 359 of the Laws of 1870, certain questions of construction are raised by the contestant, as to the validity of some of the provisions of the will, viz.: The right of the legatee and devisee, Bradley, as a non-resident alien, to take either real or personal property; also as to the validity of the concluding bequest, to the Roman Catholic Little Sisters of the Poor of the city of New York, an institution called the "Home for the Aged of the Little Sisters of the Poor of the city of New York," it being claimed that there is no such corporation entitled to receive the legacy; and that, if such corporation existed, the provisions of the will referred to would be void, under section 6 of the Act of 1848, chapter 319, because the will was not made at least two months before the death of the testatrix.

The learned counsel for the legatee, Bradley, objects to the authority of the Surrogate to construe the instrument, for the reason that he alleges that the proper parties are not before the court, and that in a certain event the heirs of Bradley and of the contestant might

take proceedings for such a construction, unaffected by the decree. on such construction in this court. But I am inclined to the opinion that he is mistaken in that respect, for the reason that Mr. Bradley's interest in the real estate, 122 East Fortieth street, does not depend upon his surviving the contestant, the life-tenant, but that such interest vested in him at the decease of the testatrix, subject to the contestant's life-interest, providing said Bradley shall be adjudged capable of taking, and hence a determination of that question would bind his heirs or devisees as privies in estate. So, in respect to the heirs of contestant, if it should be adjudged that Mr. Bradley cannot take by reason of his alienage, that portion of the estate admitted to be given to him would belong absolutely to the contestant, and if it should appear that there was no such organization as the Little Sisters of the Poor entitled to take, then clearly the property thus intended to be disposed of would go to the contestant as heir and next-of-kin ; and hence all the parties interested in the questions raised as to the construction of the instrument, are now before the court, and any determination made would bind all those entitled to the interests and rights of the contestant, and I entertain no doubt that any determination upon the question raised would be conclusive upon all parties entitled to claim an interest in the property in question.

Until the act of 1870, Surrogates had no power to construe wills on probate, and I am informed that my predecessors never exercised the authority conferred by that act; and as that act seems not to be obligatory upon the Surrogate of this county, to whom the jurisdiction is limited, and as the Code of Civil Procedure, which will

come into effect on the 1st day of September next, limits. the authority of the Surrogate to construe, to wills of personal property (§ 2634), and may be regarded as a legislative expression of opinion that such jurisdiction ought not to be exercised by Surrogates over wills of real estate, I am of the opinion that the construction of the will under consideration should be limited to the third clause, and that the parties be left to their remedy by suit in the Supreme Court for the construction of the other provisions objected to.

The next point to be considered, is whether Mr. Bradley's alienage forbids his taking the income directed to be paid to him by the executor under the third clause of the will.

The proponent's counsel claims that the executor by that clause is made an active trustee, and that the title to the property vests in him as such, and therefore a receipt through him as trustee is not obnoxious to the restrictions of the statute as to alienage ; while the contestant's counsel claims that the clause in question only creates a passive trust, and if it shall be adjudged to be active, and therefore authorized by section 55 of 2 *R. S.*, p. 1106, subd. 3 (6 ed.), yet it is a receipt of the proceeds of real estate, and comes within the spirit of the prohibition contained in section 6 above stated.

The language of the 3d clause, under consideration, is as follows :

"It is my will and desire that my executor hereinafter named pay to the Rev. Aloysius J. D. Bradley all the income derived from my estate, after paying the necessary expenses accruing thereon."

In Vernon v. Vernon (53 N. Y., 349) it is held that a power to receive the rents and profits is necessarily implied from the duty enjoined upon the executors to apply them.

The testator in that case gave to his wife an annuity of $700, to be paid by the executor out of her share of the rents of certain stores, of which she owned a moiety, and it was held that a power to receive the rents and profits was necessarily implied from the duty enjoined upon the executor to apply them. (See also Tobias v. Ketchum, 32 N. Y., 319; Betts v. Betts, 4 Abb. New Cas., 317, 385; Leggett v. Perkins, 2 N. Y., 297.)

It appears that the principal part of the decedent's estate consists of real estate, and "the income therefrom, after paying the necessary expenses accruing thereon," embraces principally decedent's real estate.

From the authorities above cited it is apparent that when the executors are directed to pay the income so derived, to Mr. Bradley, there is an implied power conferred upon the executor, within the third subdivision of section 55 of the Revised Statutes, above cited, "to receive the rents and profits of decedent's lands, and apply them to (said Bradley's) use during his life," and thus an active trust is created within that statute.

The subdivision referred to provides that an express trust may be created to receive the rents and profits of lands, and apply them to the use of *any* person during the life of such person, or any shorter term; hence there is nothing in that provision which intimates that a trust to receive and apply such rents may not be for

the benefit of a non-resident alien, but inferentially it *authorizes* such trust, by the use of the general term *any person.*

But it is claimed, by the learned counsel for the contestant, that the *cestui que trust* Bradley, though he receives the rents and profits through the intervention of the trustee and executor, yet he receives an interest in the land, and is therefore prohibited by section 6 of the Revised Statutes, as an alien; but it has been shown that the third clause of the will creates an express trust.

By section 73 of the same statute, at page 1109, it is provided that every express trust, valid as such in its creation, except as therein otherwise provided, shall vest "*the whole estate in the trustee, in law and equity,*" subject only to the execution of the trust, and that the person for whose benefit the trust is created shall take no estate or interest in the land, but may enforce the performance of the trust in equity.

This statute seems to remove the objection upon which the statute prohibiting the conveyance or devise of real estate to an alien is based; for the estate, both legal and equitable, being in a resident trustee, amenable to the control of our courts, there seems to be no more reason for excluding an alien from participation in the rents and profits of real estate through the intervention of a trustee, than there would be to his receipt of personal property by the same intervention, or his independent ownership thereof.

*Perry on Trusts,* section 64, says, that if an alien is made *cestui que trust* of land, he may enjoy it against all but the state, "but the state can at any time claim an equitable interest, and that this rule applies where a

mere naked trust is created for an *alien's* benefit; but if a trustee is to do anything with the land, that is executory; the court will do nothing to transfer the right of the alien to the state," citing Hommelin *v.* Sheldon (1 *Bevan*, 79).

Under these latter authorities, the trust in question would have been held valid at common law, and, in order to avoid it under our statute, it is obvious that it should be brought substantially within its terms of prohibition, and from the reasoning already presented it is apparent that there is no *title* or *interest* in the *land* in question vested in the *cestui que trust*, Mr. Bradley. I am, therefore, of the opinion that the third clause of the will under consideration creates a valid trust in the executor for the benefit of Mr. Bradley, though an alien.

Ordered accordingly.